21552. INTERNATIONAL LONGSHOREMEN'S ASSN., AFL-CIO, *et al.* v. GEORGIA PORTS AUTHORITY.

ARGUED FEBRUARY 12, 1962—DECIDED MARCH 8, 1962.

*Hartridge & Hartridge, Sewall Myer, Julian Hartridge, Sr.,* for plaintiffs in error.

*Eugene Cook, Attorney-General, Adams, Adams & Brennan, Anton F. Solms, Jr., Fisher & Phillips, Erle Phillips, John Bacheller, Jr.,* contra.

ALMAND, Justice. The bill of exceptions seeks to review orders: (1) overruling a general demurrer and a motion to dismiss a petition praying for injunctive relief and (2) enjoining permanently the defendants from picketing the premises of the plaintiff. The questions of law presented by the pleadings and evidence are (a) is the Georgia Ports Authority an employer under the provision of the National Labor Relations Act (29 U.S.C.A. § 152 (2, 3)) and subject to its jurisdiction? and (b) if it is not so subject, was it error to enjoin the defendants from engaging in peaceful picketing?

■ The general demurrer and motion to dismiss. In its peti-

tion the Georgia Ports Authority, alleging itself to be an instrumentality and a political subdivision of the State of Georgia in the operation of the Savannah State Docks and warehouses, named as defendants the national and local organizations of the International Longshoremen's Association, AFL-CIO, and two of their officers, individually and as representatives of the class composed of members of both groups. In the operation of State docks and warehouses at its Garden City Terminals and Ocean terminals it employs a hundred or more persons. In October, 1960, the Ports Authority received a letter dated October 25, 1960, from the defendant, Massey, an officer of the international association, enclosing a contract on behalf of the defendant local association. The proposed agreement provided a schedule of wages, for straight time and overtime, a basic working day of eight hours, holidays, and contributions by the Ports Authority to a welfare, pension, and vacation fund for the benefit of its employees. The members of the local association were to be given employment if they were available and could satisfactorily qualify as to physical fitness and experience. Should the union file a complaint with the Ports Authority regarding the discharge of a member of the union, the matter was to be referred to a grievance committee composed of two men chosen by the union and two chosen by the Ports Authority. If these four could not agree they would appoint a fifth member, and a decision by a majority of this committee would be binding on the Ports Authority. Matters of seniority were to be settled by negotiation, and all disputes and controversies arising if not settled by the parties to the agreement were to be submitted to a board of arbitration. Massey, in transmitting the proposed agreement, said: "We are proposing that you accept same, notifying the undersigned as soon as possible preferably in fifteen (15) days of your decision."

The Ports Authority did not respond to the letter or execute the contract. It was alleged that, on December 8, 1960, the defendants caused pickets to be placed in in front of both entrances to the Garden City Terminals of the Ports Authority carrying signs reading "State Docks Unfair to ILA, AFL-CIO. Non-Union State Docks Unfair to ILA, AFL-CIO." The warehouse

employees of the Ports Authority and the longshoremen, members of the local union, refused to cross the picket lines. The reason for the picketing was to force the Ports Authority to sign the proposed contract, which proposal as to employment would be in violation of the laws of Georgia. *Code Ann.* §§ 54-902, 54-801, 54-804 (Ga. L. 1947, pp. 616-621). It was further alleged that the defendants were seeking through picketing to compel the Ports Authority to recognize the defendant union organization as the exclusive bargaining agent of its warehouse employees and to execute the proposed labor contract which the Ports Authority is not required to do as a political subdivision of the State and, as such, is immune from any picketing by the defendants.

It was further alleged that the Ports Authority in the operation of its facilities handles and dispatches cargo vital to national defense; that the general economy of Georgia is dependent upon receiving and shipping of many items of products; and that the closing of the port facilities will cause irreparable injury.

The petition prayed for a temporary and permanent injunction restraining the defendants from picketing the Ports Authority's facilities.

(a)   One of the grounds of the general demurrer and the motion to dismiss is that the trial court did not have jurisdiction over the subject matter, a dispute between an employer, engaged in interstate commerce, and its employees as to wages and working conditions, but that the exclusive jurisdiction of such controversies was vested in the National Labor Relations Board under the Labor Management Act. 29 U.S.C.A. § 151. See § 152 (2, 3) of that act which provides that the term "employer" "shall not include . . . any State or political subdivision thereof," and the term "employee" "shall not include any individual employed . . . by any other person who is not an employer as herein defined."

The petitioner in this case was created by the legislative act of 1945 (Ga. L. 1945, p. 464; as amended, Ga. L. 1949, p. 778, Ga. L. 1955, p. 120, Ga. L. 1958, p. 714, Ga. L. 1960, p. 150), and all of its authority, powers, and duties are provided for by

that act. That act created " . . . a body corporate and politic to be known as The State Ports Authority, which shall be deemed to be an instrumentality of the State of Georgia and a public corporation . . . said authority shall have perpetual existence." The authority consists of five members appointed by the Governor. It was authorized to own, operate, and maintain wharves, docks, ships, piers, warehouses, and other structures and ". . . any and all facilities needful for the convenient use of the same in the aid of commerce. . ." It was granted authority to acquire property for public use by purchase, lease, or condemnation, and to use and administer such sums of money appropriated by the General Assembly for the purposes of the authority. Section 15 of the act of 1945 (*Code Ann.* § 98-217) provides: "It is hereby found, determined and declared that the creation of the Authority and the carrying out of its corporate purpose is in all respects for the benefit of the people of this State and is a public purpose and that the Authority will be performing an essential governmental function in the exercise of the power conferred upon it by this act," and that the property and revenue bonds of the authority should be exempt from all taxation within the State. The act as amended provides that the Ports Authority can sell, lease, or mortgage any of its properties only after being approved by the Governor, State Auditor, and Attorney General, and cannot purchase any real property without the consent and approval of the State Property Acquisition Commission.

Article VII, Sec. II, Par. I (6) of the Constitution of 1945 (*Code Ann.* § 2-5501 (6)) authorizes the General Assembly to levy taxes to be used to construct and maintain State docks. In *Sigman v. Brunswick Port Authority*, 214 Ga. 332 (104 SE2d 467), we had before us the validity of certain provisions of the act of 1945 (Ga. L. 1945, p. 1023) creating the Brunswick Port Authority. In all essential respects, pertinent to the issue here, that act is similar to the State Ports Authority Act of the same year. It was there held that the Port Authority holds title to the property it possesses only for the benefit of the State and the public; that the authority is an instrumentality of the State or a subordinate public authority or corporation of

the State; that public property embraces property held by a subordinate public corporation holding the same exclusively for the benefit of the State; that "Property used for the purpose of public convenience and welfare in the matters of public travel and transportation and to facilitate public transportation and as a dock or port operation, to provide buildings which the users of the port may lease, and in which to store and process commodities transported by water, is in the aid of commerce, and is for the promotion of public transportation, public commerce, and general welfare, and may properly be classified as public property . . . "; and that " . . . the acquisition, construction, maintenance, and operation of public ports, docks, wharves and related facilities is a function ordinarily carried on by the State, or a State instrumentality, and a legitimate function of State government."

Whether the Georgia Ports Authority in the operation of the Savannah port facilities is or is not a "political subdivision of the State", is of little importance because, in view of express provisions of the act creating the authority and the ruling in the *Brunswick Port Authority* case, 214 Ga. 332, supra, the operation of the Georgia Ports Authority is action by the State for a public benefit. The Ports Authority is a creature of the State, and in the operation of the docks, wharves, etc., it does so as the instrumentality of the State for governmental purposes as authorized by the Constitution. The Ports Authority as an employer comes within the exception provision of the National Labor Relations Act and is not subject to the jurisdiction of the National Labor Relations Board. In cases similar to the one before us, the National Labor Relations Board has held that it did not have jurisdiction. New Bedford Steamship Authority, 127 N.L.R.B. 1322, 46 L.R.R.M. 1173; New Jersey Turnpike Authority, 33 L.R.R.M. 1528; and Mobile Steamship Association, 8 N.L.R.B. 1297, 3 L.R.R.M. 226.

(b) It is contended by the defendants that the petition only alleges peaceful picketing of the port facilities, and that those on the picket line have as a part of the constitutional freedom of speech the right to make known their grievances against their employer as to wages and working conditions.

The petition alleges that the picketing of port terminals was done with the purpose of forcing the Ports Authority to sign a collective bargaining agreement controlling the hiring and discharging of its employees and fixing a scale of wages and working conditions; that, as a political subdivision of the State, it was not authorized to recognize by contract the defendant unions as the exclusive bargaining agent of its warehouse employees; and that the Ports Authority, being an agent of the State of Georgia, was immune from picketing. It was further alleged that the acts of the defendants were in violation of certain laws of this State.

Where picketing the premises of the employer is for an unlawful purpose, though peacefully, it can and should be enjoined. *Woodard v. Collier*, 210 Ga. 239 (78 SE2d 526). In *Ellis v. Parks*, 212 Ga. 540 (93 SE2d 708), it was held: "The judicial theory that peaceful picketing is a form of free speech, as announced in Carlson v. California, 310 U.S. 106 (60 SC 746, 84 LE 1104), which is protected by the Constitutions, both Federal and State (*Code Ann.* §§ 1-801, 2-115), can not be stretched to shield malevolent picketing for the purpose of injuring the employer and aiding an unlawful strike. Both the Supreme Court of Georgia and the Supreme Court of the United States have held that a person can not employ lawful acts for spite and solely for the purpose of injuring another, and that such malicious purpose renders the acts unlawful." In *Powers v. Courson*, 213 Ga. 20 (1) (96 SE2d 577), it was held that, where the evidence demands a finding that a picket was placed on the job for the purpose of forcing the employer to employ only union labor, or be unable to comply with the terms of his contract because of the refusal of the members of other unions employed in the work to cross the picket line, constituted picketing for an unlawful purpose in violation of *Code Ann.* § 54-804 and *Code* § 66-9906.

The trial judge in an able and well considered opinion in this case concluded that " . . . it is contrary to the public policy of the State of Georgia for State employees to strike . . . " citing in support of this finding like rulings of other jurisdictions. State v. Brotherhood of R. Trainmen, 37

Cal. 2d 412 (232 P2d 857), cert. den. 342 U.S. 876; Nutter v. City of Santa Monica, 74 Cal. App. 2d 292 (168 P2d 741); Port of Seattle v. Longshoremen's Union, 52 Wash. 2d 317 (324 P2d 1099, 42 L.R.R.M. 2462); and Norwalk Teachers' Association v. Board of Education, 138 Conn. 269 (83 A2d 482, 31 ALR2d 1133). See Springfield v. Clause, 356 Mo. 1239 (206 SW2d 539).

This conclusion is fully sustained by the act approved March 3, 1962 (Ga. L. 1962, p. 459), which provides: "No person holding a position by appointment or employment in the government of the State of Georgia or any agency, authority, board, commission, or public institution thereof shall promote, encourage or participate in any strike, . . . The word 'strike,' as used herein, shall mean the failure to report for duty, the wilful, absence from one's position, the stoppage or deliberate slowing down of work, or the withholding, in whole or in part, of the full, faithful and proper performance of the duties of employment, for the purpose of inducing, influencing or coercing a change in the condition, compensation, rights, privileges or obligations of State employment; . . . Any person not a State employee who shall knowingly incite, agitate, influence, coerce, persuade or picket to urge a State employee to strike shall be deemed guilty of a misdemeanor, . . . " This court will apply the law as it exists at the time of its judgment if such application does not affect a previously vested interest. *City of Valdosta v. Singleton,* 197 Ga. 194, 208 (28 SE2d 759).

We, therefore, hold that the State Ports Authority in the operation of the docks and warehouses at its Savannah terminals was without authority to enter into an agreement with any third party fixing the terms and conditions of the employment of personnel working for the authority. It appeared from the petition that the purpose of the strike by its employees and the subsequent picketing of the terminals by its employees and others was to force the authority to enter into a bargaining agreement with the defendants. Such action being against the public policy of the State was unlawful under the act of 1962.

It was not error to overrule the general demurrer and the motion to dismiss.

■ After a hearing the court granted an interlocutory injunction. When the case came on for the grant of a permanent injunction, counsel for all the parties made motions for a summary judgment. It was agreed by the parties that the trial judge, without the intervention of a jury, could enter a final decree upon the pleadings and evidence adduced at the hearing on the prayers for an interlocutory injunction. The evidence supported the allegations in the petition that the international union did make a demand upon the Ports Authority to sign a collective bargaining agreement; that, on the morning of December 8, 1960, picket lines were established at the main entrances of the port terminals, the pickets carrying signs reading "State Docks Unfair to I.L.A.,—American Federation of A.F.L.-C.I.O. State Docks unfair to I.L.A.-C.I.O."; and that employees of the Ports Authority, members of the union and longshoremen's union members of other employers would not cross the picket line. The result was a complete stoppage of the operation of the port facility which handled 30% to 35% of the tonnage coming into the port of Savannah. There was evidence that in the purchase of the property by the authority there was involved some $800,000 of State funds. The labor policy of the employees is established by the board of directors of the Ports Authority. There was evidence on behalf of the union that the local I.L.A. union did not authorize the strike but did direct the establishment of the picket lines for the purpose of advertising peacefully the unfair labor practices of the Ports Authority, and that seventy employees of the authority were members of the local union and fifteen of this number voted to picket. The result of the picketing was that the operations of the authority and other private groups in the loading, unloading, docking, and warehousing ceased.

We are of the opinion that, under the rulings in the first division of this opinion and the evidence, the order granting a permanent injunction was not only authorized but demanded.

*Judgment affirmed. All the Justices concur.*