39674. LOCAL DIVISION 732, AMALGAMATED TRANSIT UNION et al. v. METROPOLITAN ATLANTA RAPID TRANSIT AUTHORITY.

MARSHALL, Presiding Justice.

This is a dispute between the Metropolitan Atlanta Rapid Transit Authority (MARTA) and Local Division 732, Amalgamated

Transit Union (the Union). The question for decision concerns MARTA'S revocation of its consent to arbitrate a collective-bargaining agreement with the Union. The superior court ruled that, under Georgia law, MARTA had a right to revoke its consent to arbitrate prior to the arbitration award and that MARTA did so revoke its consent here. For reasons which follow, we affirm.

"The Urban Mass Transportation Act of 1964 (UMTA) enables state and local agencies to obtain federal assistance to finance mass transportation services in urban areas. 49 U. S. C. § 1602 (1976). Section 13(c) of the Act, 49 U. S. C. § 1609(c) (1976), establishes as a 'condition of any assistance . . . that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance.' The section further requires that the labor protective arrangements include such provisions as may be necessary to certain enumerated objectives. Finally, § 13(c) directs that the 'terms and conditions of the protective arrangements' shall be specified in the grant contract between the local authority and the federal government. In practice, the protective arrangements made pursuant to § 13(c) are written agreements (13 (c) agreements) negotiated between the applicant for federal assistance and the bargaining representative of its employees and then approved by the Secretary of Labor.

"MARTA, a public body corporate providing transit service in Atlanta, Georgia, has received UMTA grants for the acquisition, improvement, and operation of its bus and rail transit system. As a grant applicant, MARTA has entered into 13(c) agreements with the Union, which is the collective bargaining representative for a unit of MARTA's employees. The most recent such agreement was executed on February 14, 1977, and, like its predecessors, was determined by the Secretary of Labor to be a fair and equitable protective arrangement." (Footnote omitted.) Local Div. 732, Amalgamated Transit Union v. MARTA, 667 F2d 1327, 1329 (11th Cir. 1982).

The 1977 collective-bargaining agreement between MARTA and the Union (referred to as the § 13(c) agreement) became effective on June 28, 1978, through June 27, 1981. This agreement was to continue from year to year after June 27, 1981, unless either party notified the other party not less than sixty (60) days prior to expiration of the agreement, or each extension thereof, of the decision to terminate the agreement, or to negotiate changes, modifications, or additions thereto. MARTA notified the Union on April 23, 1981, that it desired to negotiate a new collective-bargaining agreement. Negotiations between MARTA and the Union failed to produce a new agreement, and on June 25, 1981, the Union demanded arbitration of the terms and conditions of the new labor agreement

pursuant to Paragraph 20 of the 1977 (§ 13(c)) agreement.

Paragraph 20 provides, in pertinent part: "In case of any labor dispute or controversy regarding the application, interpretation, or enforcement of any of the provisions of this Agreement which cannot be settled by collective bargaining within sixty (60) days after the dispute or controversy first arises, such dispute or controversy may be submitted at the written request of either party hereto to a board of arbitration as hereinafter provided. Upon such written request for arbitration, each party shall, within ten (10) days after such request, select one member of the arbitration board, and the members thus chosen shall select a neutral member who shall serve as chairman . . . the decision by majority vote of the arbitration board shall be final, binding and conclusive . . ."[1]

---

[1] It was § 20(b) of the MARTA Act of 1965 (Ga. L. 1965, pp. 2243, 2273), which authorized the Board of Directors of MARTA to bargain with MARTA employees "through such agents in the same manner and to the same extent as if they were the employees of any privately-owned transportation system." This created an exception for MARTA, because under Georgia law local governmental entities generally are not permitted to bargain collectively with employee representatives. See *Intl. Longshoremen's Assn. v. Ga. Ports Auth.,* 217 Ga. 712 (1b) (124 SE2d 733) (1962).

However, the 1982 Session of the Georgia General Assembly passed an Act which, among other things, amended the 1965 MARTA Act by striking § 20(b) and replacing it with § 20(b)(1) through (b)(8). Ga. L. 1982, pp. 5101, 5104, § 3. Section 20(b)(2) of the 1982 Act distinguishes between "interest arbitration" ("arbitration which determines or formulates the terms and conditions of a labor agreement between the Authority and the authorized representative, including the formulation of contract provisions governing wages, hours, and working conditions.") and "grievance arbitration" ("arbitration of a dispute between the Authority and the authorized representative acting on behalf of an employee which involves the application or interpretation of the terms and conditions of an existing labor agreement."). Subsection (b) (2) requires MARTA to submit labor disputes to binding grievance arbitration; and labor disputes which involve the formulation of contract provisions other than wages, and which cannot be settled by collective bargaining or fact-finding under subsection (b) (5), shall be submitted to binding interest arbitration. Subsection (b) (2) further provides that "[a]ny labor dispute involving the formulation of contract provisions governing wages may, with the consent of both parties, be submitted to binding interest arbitration." Subsections (b) (2) (A) through (G) specify certain inherent rights of MARTA management which cannot be diluted, diminished, or impaired by an arbitration award or labor agreement. Subsection (b) (3) requires any neutral arbitrator appointed or selected to decide any interest arbitration to be a resident of either Fulton or DeKalb County. Subsections (b) (4) (A) through (F) require the arbitrator in interest arbitration proceedings to give weight primarily to certain factors, e.g., financial ability of MARTA to pay wages, the amount of any fare increase which would be necessary to afford a wage or salary increase, a comparison of wages, hours, working conditions, etc., between MARTA employees and other workers in the public and private sectors

Paragraph 20 goes on to state that "the term 'labor dispute' for the purposes of this paragraph, shall be broadly construed and shall include but not be limited to, any controversy concerning wages, salaries, hours, working conditions, or benefits, including health and welfare, sick leave, insurance, or pension or retirement provisions, any differences or questions that may arise between the parties, including the making or maintaining of collective-bargaining agreements, the terms to be included in such agreements, or any grievances that may arise, and any controversy arising out of or by virtue of any of the provisions of this agreement for the protection of employees affected by the Provision (1977 § 13(c) Agreement)."

Pursuant to Paragraph 20, three arbitrators were appointed. Arbitration hearings were held in October and November of 1981. The neutral arbitrator proposed an award, but neither of the other arbitrators was agreeable to it. On January 29, 1982, the Eleventh Circuit Court of Appeals issued an opinion in Local Div. 732, Amalgamated Transit Union v. MARTA, 667 F2d 1327, supra, holding that the federal courts do not have jurisdiction over a suit alleging breach of a § 13(c) agreement between a local transit authority which is an UMTA grant recipient and a union representing its employees.

On February 22, some of the MARTA board of directors had a meeting with various of MARTA's attorneys to discuss the impact of Local Division 732, supra, on MARTA's and the Union's pending arbitration proceedings. Fairly viewed, the record shows that a vote was taken at this meeting for MARTA to withdraw from arbitration with the Union. The public was not given notice of this meeting, although later that day there was a regularly scheduled meeting of the MARTA board, of which the public was given notice.

On February 22, MARTA's General Manager, Alan Kieper, notified the Union president in writing that MARTA was revoking its consent to arbitration. However, on February 23, MARTA and the Union received another proposed arbitration award from the neutral arbitrator, and the Union has sought to approve this award.

On February 23, MARTA filed this complaint against the Union, the arbitrator appointed by the Union, and the neutral arbitrator. In this complaint, MARTA requests declaratory judgment that MARTA is not obligated to engage in arbitration with the Union concerning the terms of a collective-bargaining agreement to replace the agreement between MARTA and the Union which

---

of the metropolitan area who perform similar work. The 1982 Act became effective upon being signed by the Governor, which occurred on April 20, 1982.

expired on June 27, 1981. MARTA argues that it has withdrawn its consent to arbitrate, and MARTA also requests that the Union and non-MARTA arbitrators be enjoined from continuing with arbitration proceedings.

After entering various temporary restraining orders, the superior court entered a final judgment, concluding that under Local Div. 732, Amalgamated Transit Union v. MARTA, supra, Georgia law is controlling here. The superior court further concluded that under Georgia law, MARTA could and did revoke its consent to arbitration. Accordingly, final judgment was entered in MARTA's favor. The Union appeals.

1. The first question for consideration is whether the superior court was correct in ruling that state law applies in determining the revocability of MARTA's and the Union's arbitration agreement.

Local Div. 732, supra, and the subsequent decision of the United States Supreme Court in Jackson Transit Auth. v. Local Div. 1285, Amalgamated Transit Union, 457 U. S. 15 (102 SC 2202, 72 LE2d 639) (1982) clearly hold that § 13 (c) agreements between a local transit authority which is an UMTA grant recipient and a Union representing its employees are governed by state law to be applied in state courts. Cf., Republic Steel Corp. v. Maddox, 379 U. S. 650 (85 SC 614, 13 LE2d 580) (1965) and cits.

In the course of rendering the decision in Jackson Transit Auth., supra, the Court noted that labor relations between local governments and their employees are the subject of a long-standing exemption under the National Labor Relations Act, so that relations between local governmental entities and unions representing their employees are governed by state law. 102 SC at p. 2207. Citing from the Senate Hearings on UMTA, the Court noted that assurances had been made that if local law prohibited governmental employees from striking, this ban would not be superseded by UMTA. By a parity of reasoning, Jackson dictates that the enforceability and/or revocability of arbitration agreements between local transit authorities and their unions are governed by state law, notwithstanding the fact that the transit authority is an UMTA grant recipient.

2. In Georgia, there are two types of arbitration, common law and statutory. See 2 EGL 168, Arbitration and Award, § 4 et seq. (1976 Rev.). The arbitration proceedings which took place in the present case are of the common-law variety.

The Union argues that the touchstone for determining whether an agreement to arbitrate is revocable is whether the issue being arbitrated is justiciable. Thus, the Union argues that the arbitration proceedings between it and MARTA were not revocable, since the

issue being arbitrated, i.e., the terms and conditions of a new collective-bargaining agreement, was not justiciable. We agree that the issue being arbitrated between MARTA and the Union was not justiciable, but we disagree that the arbitration agreement was not revocable.

As to common-law arbitration, the rule which obtains in Georgia can be stated as follows: When a contract contains a stipulation that the decision of arbitrators upon certain questions shall be a condition precedent to the right of action upon the contract, such stipulation generally will be enforced; however, when a contract contains a general agreement to arbitrate all questions, or to submit all matters in dispute to arbitration, the agreement to arbitrate may be revoked by either party at any time before the award. *Wright v. Cecil A. Mason Const. Co.,* 115 Ga. App. 729 (1) (155 SE2d 725) (1967).

The following statements from *Parsons v. Ambos,* 121 Ga. 98, 101 (48 SE 696) (1904) demonstrate that, regardless of the rationale for the rule, general agreements to arbitrate are revocable before the award: "Courts favor the submission of controversies to speedy and inexpensive tribunals of the parties' own selection, and generally, in the absence of fraud or palpable mistake, will not interfere with their findings, even though a verdict of a jury to the same effect might be set aside as contrary to law. But the underlying reason for the recognition of the award is found in the fact that the parties not only agreed to submit their differences, but voluntarily permitted the agreement to be executed, and consented for the award to be actually made by judges of their own selection. The mere executory agreement to submit is generally revocable. Otherwise nothing would be easier than for the more astute party to oust the courts of jurisdiction. By first making the contract and then declaring who should construe it, the strong could oppress the weak, and in effect so nullify the law as to secure the enforcement of contracts usurious, illegal, immoral, or contrary to public policy . . . A common-law agreement, therefore, to submit the validity and effect of a contract, or to submit all matters in dispute, to arbitration, may be revoked by either party at any time before the award . . . Some of the early cases put this rule upon the ground that a provision whereby the courts may be ousted of their jurisdiction is repugnant to that other provision, implied in every contract, that its validity and effect shall be determined by the courts and the law of the land. But whether predicated on the idea that the agreement is repugnant to the contract, or to public policy, the principle is universally recognized that such general submissions are revocable."

Although the principle, that general submissions are revocable at any time before the award, may no longer be universally

recognized, it is still recognized in Georgia. The agreement between MARTA and the Union was to submit any labor dispute to arbitration. This was, therefore, a general submission, and the superior court was authorized in finding from the record that it was revoked by MARTA before the award.[2]

3. However, the Union argues that MARTA, by its conduct, either waived its right or is estopped to assert its right to revoke its consent to arbitration.

This is really a two-pronged argument.

(a) First, the Union argues that, under various federal laws,[3] MARTA is required to submit to binding arbitration and, therefore, cannot withdraw its consent to arbitrate. However, as we have previously stated, Local Div. 732, supra, and Jackson Transit Auth., supra, hold that state law is applicable here. And, as held by the superior court here, Paragraph 20 of MARTA's § 13(c) agreement with the Union requires MARTA to be bound by any arbitration award, but, under state law, MARTA can withdraw its consent to arbitrate the matter in dispute before the award.

(b) Second, the Union is arguing that MARTA officials made various statements in collective-bargaining agreement negotiations with the Union, in litigation between MARTA and the Union, and in testimony before a congressional sub-committee, to the effect that the § 13(c) agreement required MARTA to submit disputes with the Union to binding arbitration. Therefore, the Union argues that, under doctrines of either waiver or estoppel, MARTA is now barred from revoking its consent to arbitrate.

These statements of MARTA officials were, quite obviously, based on MARTA's interpretation of its obligations to arbitrate with the Union under federal law. Local Div. 732, Amalgamated Transit Union v. MARTA, supra, and Jackson Transit Auth., supra, have now held that these obligations must be adjudged under state law. The Union argues, in effect, that these decisions cannot be applied here, because MARTA had previously operated under the

---

[2] Whether MARTA's assertion of its right to withdraw from arbitration under state law constitutes a violation of the fair-and-equitable-arrangement requirements of UMTA is an issue currently being litigated between the Union and the United States Secretary of Labor in the U. S. District Court for the District of Columbia. Amalgamated Transit Union, AFL-CIO v. Donovan (Civ. No. 82-2042). The Union has brought suit against the Secretary of Labor, arguing that MARTA has forfeited its eligibility for federal funding.

[3] Specifically, the Union argues that the Federal Arbitration Act, 9 USC § 1 et seq., is applicable here. See *West Point-Pepperell v. Multi-Line Indus.,* 231 Ga. 329 (201 SE2d 452) (1973).

assumption that federal law and not state law is controlling. We find this argument to be unpersuasive.

4. Finally, the Union argues that MARTA's decision to revoke its consent to arbitration was made at the February 22 meeting of the MARTA board, which was not open to the public. Therefore, the Union argues that MARTA's revocation of its consent to arbitrate violated Georgia's so-called Sunshine Law. Ga. L. 1972, p. 575 et seq.; as amended, Ga. L. 1982, p. 1810 et seq. (Code Ch. 40-33; OCGA Ch. 50-14).

As previously stated, the February 22 meeting alluded to by the Union was a meeting between some members of the MARTA board and MARTA's attorneys, and the purpose of the meeting was to discuss the impact of the 11th Circuit decision in Local Div. 732, supra, on the arbitration proceedings then pending between MARTA and the Union. We agree with MARTA that, under the Sunshine Law, the public may be excluded from such meetings between members of a public agency and its attorneys in order to protect the attorney-client privilege. OCGA § 50-14-2 (Code Ann. § 40-3303).

In addition, at the time of the February 22 meeting, the Sunshine Law applied only to "meetings . . . at which official actions [were] to be taken . . ." Code Ann. § 40-3301 (a) (Ga. L. 1972, p. 575).[4] We agree that any vote taken at the February 22 meeting for MARTA to withdraw from arbitration with the Union did not constitute "official action," since MARTA's General Manager, under MARTA by-laws,[5] possessed the authority to revoke MARTA's consent to arbitration without board approval.

*Judgment affirmed. All the Justices concur, except Gregory, J., who dissents.*

DECIDED MAY 11, 1983.

---

[4] Effective November 1, 1982, the Sunshine Law was amended to apply to "[a]ll meetings of any agency at which official action is to be discussed or at which official action is to be taken . . ." OCGA § 50-14-1 (c) (Ga. L. 1982, p. 1810) (Code Ann. § 40-3301).

[5] The MARTA by-laws, adopted pursuant to § 6(j) of the MARTA Act, delegate to the general manager "all the power and authority delegable to him in accordance with law, including but not limited to," the following: (1) general and active supervision of the business and affairs of MARTA, and the administration of MARTA, including general supervision of the policies of MARTA and general and active supervision of the financial affairs of MARTA; (2) general superintendence and direction of all non-board member officers and employees of MARTA; (3) the power, authority, and duty to institute suits on behalf of MARTA and to defend suits brought against MARTA.

*Adair & Goldthwaite, Donald R. Livingston, Jacobs, Burns, Sugarman & Orlove, Linda R. Hirshman,* for appellants.

*Kutak, Rock & Huie, W. Stell Huie, Lawrence L. Thompson, C. Wilson Dubose, Terrence Lee Croft,* for appellee.