Alfreda DILLARD, et al.,
Plaintiffs-Appellees,

v.

Joe Frank HARRIS and Georgia Department of Human Resources,
Defendants-Appellants.

Nos. 88–8245, 88–8439.

United States Court of Appeals,
Eleventh Circuit.

Sept. 29, 1989.

Gordon R. Alphonso, Senior Asst. Atty. Gen., Atlanta, Ga., for defendants-appellants.

Kathleen L. Wilde, ACLU, Atlanta, Ga., for plaintiffs-appellees.

Before RONEY, Chief Judge, HILL, Circuit Judge, and HOWARD *, Chief District Judge.

RONEY, Chief Judge:

In this action for overtime pay pursuant to the Fair Labor Standards Act, the defendants, Georgia's Governor and Department of Human Resources ("the State"), appeal an injunction and a summary judgment for the plaintiffs, Georgia state hospital employees ("the employees"). We consolidated the two appeals, which involve the same issue: whether the district court misapplied the provisions of the Fair Labor Standards Act governing the awarding of compensatory time to state employees for overtime work in lieu of cash payments. The court ruled that the State must pay its employees for overtime hours

in the absence of a negotiated compensatory-time agreement with the employees chosen representative, even though such negotiation is prohibited by state law. Holding that where state law prohibits agreements with employee representatives, public employers may enter into individual overtime agreements with employees, we reverse.

The issue in this case was recently addressed by the Fourth Circuit in *Abbott v. City of Virginia Beach*, 689 F.Supp. 600 (E.D.Va.1988), *aff'd*, 879 F.2d 132 (4th Cir.1989). Since we agree with the analysis made in Judge Wilkins' opinion in that case, we could simply state that we are following that case and that the distinction in facts between that case and this one does not dictate a different result. In so doing, we refuse to follow the Tenth Circuit case which reached a different result. *International Association of Fire Fighters, Local 2203 v. West Adams County Fire Protection District*, 877 F.2d 814 (10th Cir.1989). Because this issue is surfacing in various courts which are reaching divergent results, however, a discussion of an alternative approach that reaches the same result may be appropriate.

Section 7(*o*)(2)(A) of the Fair Labor Standards Act relates to whether public employees should get compensatory time or money for overtime work. It provides that a public agency may provide compensatory time, rather than pay, either pursuant to a collective bargaining agreement between the employer and "representatives of such employees", *or* if employees are not covered by that provision, pursuant to an agreement between the employer and the employee arrived at before performance of the work. In the latter case, the regular practice in effect on April 15, 1986 constitutes such an individual agreement for employees hired before that date. 29 U.S.C.A. § 207(*o*)(2)(A).[1]

---

* Honorable Alex T. Howard, Chief U.S. District Judge for the Southern District of Alabama, sitting by designation.

1. Title 29 U.S.C.A. § 207(*o*) provides in relevant part:

   (1) Employees of a public agency which is a State, a political subdivision of a State, or an interstate governmental agency may receive, in accordance with this subsection and in lieu of overtime compensation, compensatory time off at a rate not less than one and one-half hours for each hour of employment for which overtime compensation is required by this section.

   (2) A public agency may provide compensatory time under paragraph (1) only—

   (A) pursuant to—

   (i) applicable provisions of a collective bargaining agreement, memorandum of under-

The critical fact in this case is that the employees designated a representative, but the employer is prohibited by law from entering into an agreement with that representative. The employees take the position that they have a representative and since there is no agreement for compensatory time, money for overtime is required. The employer takes the position that the law prohibits an agreement with an employee representative, so that the alternative section applies to make the issue turn on the agreement with the individual employee.

## I.

The problem has had an interesting history. As originally enacted, the wage and overtime provisions of the FLSA did not apply at all to employees of state and local governments. Fair Labor Standards Act of 1938, Pub.L. 75–718, § 3(d), 52 Stat. 1060. In 1966, however, Congress amended the FLSA to extend minimum wage and overtime pay coverage to many governmental employees, including those working at state hospitals. Fair Labor Standards Amendments of 1966, Pub.L. 89–601, §§ 102(a) & (b), 80 Stat. 830, 831. Georgia's state hospitals, at which the plaintiffs are employed, then began paying their workers cash for overtime work, as required by the FLSA. In 1968, the Supreme Court held that the 1966 amendments were constitutional. *See Maryland v. Wirtz*, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968).

In 1974, amendments to the FLSA extended coverage to virtually all state employees. Fair Labor Standards Amendments of 1974, Pub.L. 93–259, §§ 6(a)(1) & (6), 88 Stat. 55, 58, 60. Georgia's state agencies again complied. They continued compliance until in *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), the Supreme Court

overruled its 1968 *Wirtz* decision and held that certain provisions of the FLSA were unconstitutional because they interfered with "traditional governmental functions" at the state and local level. After *Usery*, Georgia's state agencies changed their overtime-pay practices and established a state-wide policy which, with only limited exceptions, *required* awarding compensatory time in lieu of cash payments for overtime work.

In 1985, the Supreme Court overruled *Usery* in *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). State agencies in Georgia and elsewhere again began paying cash for overtime work as the FLSA required. This had an immediate and significant impact on many state and local treasuries. After much investigation and fact-finding, Congress once more amended the FLSA, this time to afford these governmental employers some relief from the burden of paying cash overtime compensation to their covered employees. Fair Labor Standards Amendments of 1985, Pub.L. 99–150, 99 Stat. 787.

These amendments allowed public employers to give compensatory time in lieu of cash for overtime hours worked under certain circumstances. *See* 29 U.S.C.A. § 207(*o*). Pursuant to these provisions, Georgia's state agencies on March 1, 1986 once more began awarding their employees compensatory time off for overtime work.

## II.

The employees designated the Georgia State Employees' Association (GSEA) as their representative concerning overtime compensation, notified the State of this, and demanded that the State either negotiate with the representative about overtime

standing, or other agreement between the public agency and representatives of such employees; or

(ii) in the case of employees not covered by subclause (i), an agreement or understanding arrived at between the employer and employee before performance of the work; and

(B) ....

In the case of employees described in clause (A)(ii) hired before April 15, 1986, the regular

practice in effect on April 15, 1986, with respect to compensatory time off for such employees in lieu of the receipt of overtime compensation, shall constitute an agreement or understanding under such clause (A)(ii). Except as provided in the previous sentence, the provision of compensatory time off to such employees for hours worked after April 14, 1986, shall be in accordance with this subsection.

compensation, or cease using compensatory time and begin cash payments for overtime hours. Asserting that the FLSA permitted its current practice and Georgia law prohibited it from negotiating with third parties over state employees' conditions of employment, the State refused to negotiate with GSEA and continued its compensatory-time policy.

The employees then filed this suit under the FLSA. The district court, relying on 29 C.F.R. § 553.23, determined that GSEA, as the employees' *designated* representative, was a "representative" under 29 U.S.C.A. § 207(*o*)(2)(A)(i) for purposes of negotiating over compensatory time, and the State was required either to negotiate a compensatory-time agreement with GSEA or begin paying cash for the employees' overtime hours. The court enjoined the State's use, without an appropriate agreement, of compensatory time as to the employees represented by GSEA (subsequently determined to be all of the plaintiffs) and awarded the employees compensatory damages, costs, and attorneys' fees. *Dillard v. Harris,* 695 F.Supp. 565 (N.D.Ga.1987).

On appeal, the State maintains that 29 U.S.C.A. §§ 207(*o*)(2)(A)(i) & (ii), the provisions allowing agreements on compensatory time, are unambiguous and require no resort to legislative history to determine their meaning. Alternatively, the State argues that even if there is sufficient ambiguity to merit an inquiry into congressional intent, the legislative history, as evidenced by the report of the Senate Committee on Labor and Human Resources, reveals that the intended meaning to subclause (i)'s term "representative" is *recognized* representative. The State contends that the employees have no such recognized representative.

The employees respond that the intended meaning of the term "representative" in subclause (i) is sufficiently ambiguous to require an inquiry into legislative history. They rely primarily on Department of Labor (DOL) regulation 29 C.F.R. § 553.23 and the legislative history reflected in the report of the House Committee on Labor and Human Resources as proof that Congress intended for mere designative, not formal recognition, of a representative to

be sufficient. GSEA clearly was the employees' *designated* representative.

### III.

We are satisfied with the way the Fourth Circuit dealt with these arguments in *Abbott v. City of Virginia Beach,* 879 F.2d at 135, stating that the statute was unclear and looking to the legislative history, following the method of analysis of the district court. *Abbott v. City of Virginia Beach,* 689 F.Supp. 600 (E.D.Va.1988). Equally satisfactory, in our judgment, would be this analysis: the statute on its face is plain, and the legislative history does not mandate a contrary interpretation.

### IV.

■ Generally, if a statute is unambiguous on its face, the courts will look to legislative history only to see if there is a " 'clearly expressed legislative intent' contrary to that language." *Immigration and Naturalization Service v. Cardoza–Fonseca,* 480 U.S. 421, 432 n. 12, 107 S.Ct. 1207, 1214 n. 12, 94 L.Ed.2d 434 (1987) (citations omitted). If the Senate and House histories conflict, the history of the body in which the enacted bill originated is normally more persuasive. *Steiner v. Mitchell,* 350 U.S. 247, 254, 76 S.Ct. 330, 334–35, 100 L.Ed. 267 (1956).

The plain language of 29 U.S.C.A. §§ 207(*o*)(2)(A)(i) & (ii) indicates that a State agency may use compensatory time only if it does so under subclause (i) pursuant to the terms of an agreement or understanding between the agency and its employees' representative, or if the employees are not covered by such an agreement, which resolves the issue as to whether compensatory time or cash for overtime is required, the question is resolved under subclause (ii) pursuant to an agreement or understanding with each employee. It appears clear that the prerequisite for employees being "covered under subclause (i)" is an agreement or understanding between the employer and the employees' representative. Since the employees here had no agreement or understanding under subclause (i), they were not "covered" by it

and thus were governed by subclause (ii). Of course, if there is no agreement with either the representative or an individual employee, then cash, rather than compensatory time, is required.

Since the plaintiffs here were "employees described in clause (A)(ii) hired before April 15, 1986" and the "regular practice in effect on April 15, 1986" was to award compensatory time in lieu of cash payments, this regular practice "constitute[d] an agreement or understanding under such clause (A)(ii)." 29 U.S.C.A. § 207(*o*)(2)(B). Under this previously existing practice, the State could permissibly use compensatory time to pay the employees for overtime hours worked, absent a contrary agreement with an individual employee.

Having determined 29 U.S.C.A. § 207(*o*)(2)(A) to be unambiguous, we would then look to its legislative history only to determine whether it shows a clearly expressed intent contrary to this interpretation of the plain language.

## V.

The legislative history reveals no single intent. Both the Senate and House introduced bills to amend the FLSA in 1985. S. 1570, 99th Cong., 1st Sess. (1985); H.R. 3530, 99th Cong., 1st Sess. (1985). Generally, the Senate and House committee reports reflected similar intent. Both reports noted disagreement in the testimony heard about the costs of governmental agencies' FLSA compliance with the overtime-pay provisions. The committee reports concluded that states and localities required to comply with the FLSA would be forced to assume additional financial responsibilities with in at least some instances the additional costs being substantial. S.Rep. No. 159, 99th Cong., 1st Sess. 7–8 (1985) ("S.Rep. No. 159"), U.S.Code Cong. & Admin.News 1985, pp. 651, 654–656; H.R.Rep. No. 331, 99th Cong., 1st Sess. 17–18 (1985) ("H.R. Rep. No. 331").

The House committee report expressed an intent "to provide flexibility to state and local government employers and an element of choice to their employees regarding compensation for statutory overtime hours worked by covered employees." H.R.Rep. No. 331 at 19. The committee recognized the mutual benefits arising from and encouraged the continued use of compensatory time as under past arrangements. *Id.* at 19–20.

The Senate committee report likewise noted that many government employers and employees had in the past voluntarily reached compensatory time arrangements "reflect[ing] mutually satisfactory solutions that [were] both fiscally and socially responsible." S.Rep. No. 159 at 8, U.S. Code Cong. & Admin.News 1978, p. 656.

The Senate's and House's respective versions of proposed 29 U.S.C.A. § 207(*o*)'s compensatory-time requirements differed in several respects, but contained similar provisions governing agreements to allow compensatory time in lieu of cash payments for overtime work. The joint committee on conference report indicated that there was initial disagreement and eventual compromise in several areas: the method for calculating payments for compensatory time due upon termination of employment, the treatment to accord substitute employment, the limit on allowable accrual of compensatory time, the scope of the anti-discrimination provision, and time limits on protection under certain provisions. H.Conf.Rep. No. 357, 99th Cong., 1st Sess. 7–9 (1985), U.S.Code Cong. & Admin.News 1985, pp. 668–671 ("H.Conf.Rep. No. 357").

The conference committee report mentioned no disagreement or compromise on the language governing compensatory-time agreements now contained in 29 U.S.C.A. § 207(*o*)(2)(A). H.Conf.Rep. No. 357 at 7–9, U.S.Code Cong. & Admin.News 1985, pp. 668–671. There was little to disagree over since the respective versions of this provision were so similar. Despite this absence of expressed disagreement and compromise, there was no stated consensus either. The legislative history reveals no clear answer to what effect the presence or absence of a "representative" (whatever that term is interpreted to mean) would have on whether employees are "not covered by" section 207(*o*)(2)(A)(i).

Thus, there is no clearly expressed legislative intent contrary to the plain language

in the provision indicating that the presence or absence of an agreement is the factor determining whether employees are "not covered by subclause (i)." Although there are unclear and conflicting statements in the legislative history, this Court will not read into the statute a requirement not included in its plain language or clearly expressed in its history.

Even if we were to determine from the legislative history that Congress intended for the absence of a "representative" (rather than, as we interpret the statutory language to mean, the absence of an agreement or understanding) to be the factor making employees "not covered by subclause (i)," we would still conclude that the legislative history does not support the district court's ruling. The relevant provision ultimately contained in the Senate bill enacted was essentially identical to the language in both the original House bill and the original Senate bill. There were no significant differences. To the extent that the respective histories conflicted, however, the Senate history is more persuasive since the bill which was enacted originated there. *Steiner v. Mitchell*, 350 U.S. at 254, 76 S.Ct. at 334-35. The district court's order, however, did not even mention the Senate legislative history. *See Dillard v. Harris*, 695 F.Supp. 565 (N.D.Ga.1987).

Although the *language* of their respective bills dealt similarly with compensatory-time agreements, the Senate and House committee reports included one potentially significant difference in what the committees intended. The Senate report repeatedly referred to the employees' "recognized representative" as the one with whom the employer must reach agreement before using compensatory time in lieu of cash payments under subclause (i). S.Rep. No. 159 at 10-11, U.S.Code Cong. & Admin.News 1985, pp. 657-659. The House report, on the other hand, stated that the employees have a subclause (i) "representative" whenever "the employees have selected a representative, which need not be a formal or recognized collective bargaining agent as long as it is a representative *designated by the employees.*" H.R.Rep. No. 331 at 20 (emphasis added). The House and Senate committee reports contain no explanation

or resolution of this difference, nor does the report of the joint committee on conference. The legislative history thus does not clearly answer whether Congress intended that, in a situation such as is presented here, the plaintiffs' mere designation of a representative satisfies subclause (i).

The House committee report tends to support the employees' argument that since they have designated a representative, subclause (i) applies. On the other hand, the Senate committee report's use of the term "recognized representative" tends to support the State's position that that phrase means a representative with whom public agencies could lawfully negotiate, so that when state law prohibits such negotiation there can be no *recognized* representative. Since Georgia law prohibits state employers from recognizing third party representatives for purposes of negotiating with them over employment conditions, the employees lack the type of representative envisioned in subclause (i), and thus subclause (ii) applies.

## VI.

The employees contend that even if the "recognized representative" construction is applied to subclause (i), under Georgia law public agencies *may* lawfully recognize and negotiate with employee representatives over conditions of employment. The case law, however, does not support their position.

In *International Longshoremen's Association, AFL-CIO v. Georgia Ports Authority*, 217 Ga. 712, 124 S.E.2d 733, 737, *cert. denied*, 370 U.S. 922, 82 S.Ct. 1561, 8 L.Ed.2d 503 (1962), the Georgia Supreme Court upheld an injunction against state employees picketing to force the Ports Authority to enter into a collective bargaining contract. The injunction was upheld because the picketing was for an illegal purpose. The court stated that the Ports Authority was "without authority to enter into an agreement with any third party fixing the terms and conditions of the employment of the personnel working for the authority." *Id.*

Later, in *Chatham Association of Educators, Teachers Unit v. Board of Public Education*, 231 Ga. 806, 204 S.E.2d 138, 139–40 (1974), the Georgia Supreme Court refused to enforce a contract reached between a teachers' association and a local school board because the contract was void as an illegal attempt by the board to delegate its authority to control allocation of funds and conditions of teachers' employment.

More recent cases, such as *Local Division 732, Amalgamated Transit Union v. Metropolitan Atlanta Rapid Transit Authority*, 253 Ga. 219, 320 S.E.2d 742, 744 (1984), note that for Atlanta's mass transit system employees there is a statutory exception to the general principle that Georgia's governmental agencies have no authority to bargain with employee representatives over employment conditions.

Although citing no Georgia case law in their favor, the employees state that Georgia's Attorney General has suggested governmental employers have some discretion in "recognizing" and "bargaining with" employee unions. In a 1969 opinion the Attorney General stated:

> Inasmuch as I am unaware of any State statute which would require [state] hospitals to bargain collectively with hospital employees or their labor organizations, I conclude that no such legal obligation exists. This is not to say, of course, that the hospital employer could not bargain collectively if it voluntarily chose to do so.

Op. Ga. Att'y Gen., No. 69–262 (unofficial) (1969).

In 1975 the Attorney General's Office prepared a detailed position paper titled "Legal Status of Public Employee Labor Organizations in Georgia." *See* Op. Ga. Att'y Gen., p. 457 (1975). The paper advised that a public employer's "recognition" of a representative for its employees and "collective bargaining" with that representative, as those terms are defined in the Labor Management Relations Act (LMRA) context, are illegal under Georgia law. *Id.* at 462–63.

The LMRA does not apply to public employees, the Attorney General reasoned, thus in the public employment context these terms may have meanings different from their precise LMRA definitions. The position paper concluded that under Georgia law, although a state employer may not lawfully enter into a binding collective bargaining contract with an employees' representative, it may, if it so desires, "meet and consult" with the representative over wages, hours, and conditions of employment and reach an understanding, which the employer could then voluntarily adopt according to its normal policy-making procedures without improperly delegating its decision-making authority or obligating itself to bargain similarly in the future. The Attorney General surmised that Georgia courts, if confronted with the question, would reach a similar conclusion, as some other states' courts have. *Id.* at 463–65.

If the Attorney General is correct, then Georgia's state employees may not obtain a collective bargaining contract to compel their agency to bargain with their representatives over compensatory time or other employment matters. The agency may, however, if it chooses, meet with the representatives, discuss virtually any employment matter, either adopt or reject the representatives' suggestions, and ultimately reach its own informed decision. Such a procedure merely allows employee representatives to have input into the agency's ultimate decision. Having input into an employer's decision is not the same as reaching an agreement or understanding. Such a procedure plainly does not authorize an "agreement" or "memorandum of understanding" between the agency and a representative, as required by 29 U.S.C.A. § 207(*o*)(2)(A)(i).

VII.

▮ Since Georgia law does not permit such an agreement or understanding, the district court's reliance on 29 C.F.R. § 553.23 was misplaced. The regulation, like the House committee report, stated that a 29 U.S.C.A. § 207(*o*)(A)(2)(i) "representative need not be a formal or recognized bargaining agent as long as the representative is designated by the employ-

ees." 29 C.F.R. § 553.23(b). The regulatory history, however, indicates that, in promulgating the regulation, DOL considered the effect of state law.

Prior to adopting the proposed regulation, DOL received comments from many public employers' and employees' organizations. 52 Fed.Reg. 2012–13 (Jan. 16, 1987). Several governmental organizations expressed concern over the above quoted language in the regulation and the impact it might have in states whose laws prohibited public agencies from recognizing and bargaining with employees' representatives. *Id.* at 2014. DOL responded as follows:

> The Department recognizes a wide variety of State law that may be pertinent in this area. It is the Department's intention that the question of whether employees have a representative for purposes of FLSA section 7(*o*) [29 U.S.C.A. § 207(*o*)] *shall be determined in accordance with State or local law and practices.*

*Id.* at 2014–15 (emphasis added).

Under Georgia law, the employees have no representative able to bargain over compensatory time. Accordingly, when DOL adopted 29 C.F.R. § 553.23, it did not intend for the regulation to have the impact of ignoring state law.

In the *Abbott v. City of Virginia Beach* opinion, the Fourth Circuit cited several cases which reached a contrary result, including the district court decision in this case, stating that they differed from *Abbott* in several key aspects. 879 F.2d at 136. The Court noted that in *Abbott* the public employer, prohibited by state law from contracting with employee representatives, gave each employee an absolute choice of whether to accept compensatory leave in lieu of money.

The court differentiated the district court opinion in this case with the comment that the employer retained the sole discretion on whether to provide compensatory leave or money for overtime. There is nothing in this case, however, that would prevent an individual employee from negotiating for and obtaining an agreement that cash would be paid for his or her overtime work. Section 207(*o*)(2)(B) does prohibit an individual agreement, before performance of overtime work, with an employee hired prior or to April 15, 1986, that the employee should receive cash. The legal issue turns on whether the pay is governed by a collective agreement or an individual agreement, and not on the procedures by which the agreement is made. The statute itself defines what the individual agreement will be for employees hired prior to April 15, 1986, unless a different agreement is made by the employee and the employer. For employees hired after April 15, 1986, an agreement must be reached for the employer to provide compensatory time. Because of the congressional deference to the serious fiscal problems of public agencies, it is not unreasonable for the statute to give the state agencies the upper hand in this decision. In any event, if the mere designation of a representative with whom the agency could not legally make an agreement should be sufficient to control the method of compensation, it would have been simple for the statute to plainly so provide.

### Conclusion

In summary, we hold that the district court erroneously applied 29 U.S.C.A. § 207(*o*)(2)(A)(i) and 29 C.F.R. § 553.23. The plaintiff employees were *not* covered by subclause (i) of section 207(*o*)(2)(A), and as a result *were* covered by subclause (ii). Under section 207(*o*)(2)(B), the practice in effect on April 15, 1986 constituted an agreement with respect to compensatory time, absent any contrary agreement between an employee and the state employer. Under that practice, the State's use of compensatory time was proper. We reverse the district court's summary judgment and its order enjoining the State's use of compensatory time, and we remand for further proceedings consistent with this opinion.

REVERSED and REMANDED.