**AMALGAMATED TRANSIT UNION INTERNATIONAL, AFL–CIO, et al., Appellants,**

v.

**Raymond J. DONOVAN, Secretary of Labor.**

No. 84–5159.

United States Court of Appeals, District of Columbia Circuit.

Argued April 11, 1985.

Decided July 9, 1985.

Ginsburg, Circuit Judge, and MacKinnon, Senior Circuit Judge, filed concurring statements.

Jeffrey R. Freund, Washington, D.C., with whom Linda R. Hirshman, Chicago, Ill., Earle W. Putnam and Laurence Gold, Washington, D.C., were on brief, for appellants.

Robert C. Seldon, Asst. U.S. Atty., Washington D.C., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., John F. Depenbrock, Associate Sol., Department of Labor, and Trudy B. Levy, Asst. Chief Counsel, Dept. of Transportation, Washington, D.C., were on brief, for appellee.

William T. Coleman, Donald T. Bliss and Robert W. Batchelder, Washington D.C., were on brief, for American Public Transit Ass'n, amicus curiae, urging affirmance.

Before EDWARDS and GINSBURG, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

Concurring statements filed by Circuit Judge GINSBURG and Senior Circuit Judge MacKINNON.

HARRY T. EDWARDS, Circuit Judge.

Section 13(c) of the Urban Mass Transportation Act of 1964 ("UMTA" or "the Act"), 49 U.S.C.App. § 1609(c) (1982), stipulates that, before federal funds may be awarded to a formerly private but presently publicly owned transit system, the Secretary of Labor must certify that the transit authority has made a "fair and equitable" labor protective arrangement that includes, among other things, provisions ensuring employees of "the continuation of collective bargaining rights."[1]  In the present case,

---

1. Section 13(c), 49 U.S.C. App. § 1609(c) (1982), reads in full:

It shall be a condition of any assistance under section 1602 of this Appendix that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance.  Such protective arrangements shall include, without being limited to, such provisions as may be necessary for (1) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise; (2) the continuation of collective bargaining rights; (3) the protection of individual employees against a worsening of their positions with respect to their employment; (4) assurances of employment to employees of acquired mass transportation systems and priority of reemployment of employees terminated or laid off; and (5) paid training or retraining programs.  Such ar-

the Secretary of Labor certified the labor protective agreement of Metropolitan Atlanta Rapid Transit Authority ("MARTA" or "the Authority"). MARTA's certification was granted even though, under controlling state law, the Authority is prevented from bargaining collectively with the appellant Amalgamated Transit Union ("ATU") over certain essential terms and conditions of employment and is arguably granted the power to unilaterally establish wages for employees represented by the Union. The ATU here challenges the Secretary's refusal to deny certification to MARTA.

The District Court upheld the Secretary's decision, ruling that section 13(c) does not limit the Secretary to certifying only those labor agreements that contain certain specific labor protective provisions, but rather confers upon him broad discretion to determine whether an agreement, taken as a whole, is fair and equitable. *Amalgamated Transit Union v. Donovan*, 582 F.Supp. 522, 529 (D.D.C.1984). Because we read the plain language of the Act and its legislative history as mandating, rather than simply recommending, the continuation of collective bargaining rights, and because, by virtue of the current Georgia law, MARTA's labor agreement with ATU does not provide for the continuation of such rights, we reverse the judgment below, with instructions that the District Court require the Secretary to revoke his certification.

## I. BACKGROUND

Prior to 1971, mass transportation in the Atlanta metropolitan area was provided by Atlanta Transit System ("ATS"). As a private company, ATS was covered by the National Labor Relations Act ("NLRA"), and its workers enjoyed the rights protected by that statute. Appellant ATU represented ATS employees and negotiated a series of collective bargaining agreements with the company setting wages, hours and other terms and conditions of employment. These negotiations were subject to section 8(d) of the NLRA, 29 U.S.C. § 158(d) (1982), which prescribes mandatory subjects of bargaining, and ATS employees were legally entitled to strike to gain leverage in collective bargaining with ATS. Affidavit of Earle W. Putnam, General Counsel, ATU, *reprinted in* J.A. 84.

In 1965, the Georgia legislature created MARTA, a public corporation authorized to purchase and operate the mass transit system run by ATS. Although Georgia law at the time did not permit public employers to bargain collectively, *see International Longshoremen's Association v. Georgia Ports Authority*, 217 Ga. 712, 718, 124 S.E.2d 733, 737, *cert. denied*, 370 U.S. 922, 82 S.Ct. 1561, 8 L.Ed.2d 503 (1962), MARTA's enabling statute allowed the Authority to recognize the transit workers' bargaining representatives and to bargain with them "in the same manner and to the same extent as if they were the employees of any privately owned transportation system." 1965 Ga.Laws at 2243, § 20(b). In 1971, MARTA applied to the Department of Transportation ("DOT") for a grant of UMTA funds in order to purchase and operate ATS. Sections 13(c), 3(e)(4) [2] and 5(n)(1) [3] of the Act condition a grant of funds on certification by the Secretary of Labor that the state or municipal transit authority has satisfied the labor standards set forth in section 13(c). As the Supreme Court explained in *Jackson Transit Authority v. Local Division 1285, Amalgamated Transit Union*, 457 U.S. 15, 102 S.Ct. 2202, 72 L.Ed.2d 639 (1982), UMTA was passed at a time when many private transit companies were in precarious financial condition, and the statute was designed to allow local governments to step in and purchase such companies so that communities would not be

---

rangements shall include provisions protecting individual employees against a worsening of their positions with respect to their employment which shall in no event provide benefits less than those established pursuant to section 11347 of title 49. The contract for the granting of any such assistance shall specify the terms and conditions of the protective arrangements.

**2.** 49 U.S.C.App. § 1602(e)(4) (1982).

**3.** 49 U.S.C.App. § 1604(n)(1) (1982).

without transportation services. *Id.* at 17, 102 S.Ct. at 2204. At the same time, Congress recognized that many state laws forbade collective bargaining by public employers, and "was aware that public ownership might threaten existing collective-bargaining rights of unionized transit workers." *Id.* Accordingly, Congress included section 13(c) in UMTA "[t]o prevent federal funds from being used to destroy the collective-bargaining rights of organized workers." *Id.* Section 13(c) achieves this end by providing that

a state or local government must make arrangements to preserve transit workers' existing collective-bargaining rights before that government may receive federal financial assistance for the acquisition of a privately owned transit company.

*Id.* at 16, 102 S.Ct. at 2203.

MARTA, of course, was excepted from Georgia's general prohibition against collective bargaining by state and local governments, and thus, in anticipation of its application for UMTA funds, the Authority met with ATU in 1971 and negotiated a labor protective, or "13(c)," agreement. In this 1971 agreement, MARTA recognized ATU's right to engage in collective bargaining over "all subjects of collective bargaining which are or may be proper subjects of collective bargaining with a private employer." [4] The parties also provided that there would be no strikes or lockouts in the event of impasse, but rather, that either party could request that bargaining disputes be submitted to binding, or "interest," arbitration.[5] Based on this 13(c) agreement, the Secretary of Labor certified that the parties had entered into a fair and equitable arrangement protecting the transit workers' rights, and that MARTA therefore qualified for UMTA funds. In 1972, following receipt of these funds, MARTA purchased the assets, property and facilities of ATS, and ATS employees became public employees of MARTA.

During the ten years following MARTA's acquisition of the transit system, the Authority applied for and received additional UMTA funds. In each case, the Secretary of Labor certified that the parties' 13(c) agreement, which was renewed in 1977, was fair and equitable. That agreement expired in 1981, however, before MARTA and ATU were able to negotiate a new agreement, and the parties submitted their bargaining disputes to interest arbitration. During the course of the arbitration proceedings, MARTA determined that, since the agreement had expired, it was no longer obligated to pay cost of living adjustments ("COLAs") and therefore ceased all such payments. ATU sought injunctive relief in federal court, arguing that MARTA's cessation of the COLA benefits was a breach of the 1977 13(c) agreement. The district court granted the injunction, but the Eleventh Circuit dismissed the suit on appeal, holding that breach of a 13(c) agreement was not a statutory violation giving rise to a federal cause of action, but was rather a simple breach of contract action over which state, not federal, courts had jurisdiction. *Local Division 732, Amalgamated Transit Union v. MARTA*, 667 F.2d 1327, 1332, 1340, (11th Cir.1982). MARTA then revoked its consent to interest arbitration, which it claimed it had a right to do under Georgia law, and on February 23, 1982, it gained a temporary restraining order in state court against further arbitration proceedings. *MARTA v. Local Division 732, Amalgamated Transit Union*, No. C–83621 (Super.Ct. Fulton County, Ga.), *aff'd*, 251 Ga. 15, 303 S.E.2d 1 (1983), *vacated and remanded*, — U.S. ——, 104 S.Ct. 1263, 79 L.Ed.2d 670 (1984), *on remand*, 253 Ga. 219, 320 S.E.2d 742 (1984).

Shortly thereafter, in April 1982, the Georgia legislature entered the fray by passing Act 1506, which amended the 1965 MARTA Act so as to limit MARTA's authority to bargain collectively with ATU.

---

**4.** Agreement Pursuant To Section 13(c) Of The Urban Mass Transportation Act of 1964 at 2, *reprinted in* J.A. 124.

**5.** *Id.* at 4–5, 7, *reprinted in* J.A. 126–27, 129.

Specifically, Act 1506 prohibited MARTA from bargaining over five subjects that are at issue here: the assignment of employees, discharge and termination of employees for cause, subcontracting of work, fringe benefits for part-time employees, and assignment and calculation of overtime. It also changed the procedures to be followed for interest arbitration such that, where the parties could not agree on wages, the matter could be submitted to arbitration only upon the consent of *both* parties. Act 1506 § 3(b)(2), 1982 Ga.Laws at 5104.

At the time when Act 1506 was passed, MARTA had pending an application for additional UMTA funds. ATU had notified the Secretary in March, 1982, that it did not oppose certification based on the 1977 13(c) agreement, but following passage of Act 1506, MARTA objected to a certification premised on that agreement, since the new Georgia law prevented the employer from honoring the agreement's interest arbitration provisions. Both sides, of course, were anxious to avoid a loss of federal funding, and the parties therefore agreed to certification based on the 1977 13(c) agreement, with each side reserving the right to litigate in state or federal court the validity of the agreement's interest arbitration provisions in light of Act 1506.[6] On the basis of this understanding, the Secretary certified MARTA on June 11, 1982, as eligible to receive UMTA funds. On that same day, the Supreme Court handed down its decision in *Jackson Transit Authority,*

holding that 13(c) agreements are enforceable only in state courts under state law. 457 U.S. at 29, 102 S.Ct. at 2210. The Court's decision, which accorded with the Eleventh Circuit's disposition of ATU's suit against MARTA, meant that ATU could only seek enforcement of the 1977 agreement's arbitration provisions in state court, where, of course, Act 1506 would supersede the provisions of the parties' contract. Since the Supreme Court's decision effectively precluded enforcement of the 1977 agreement's impasse resolution mechanism, ATU requested on June 15, 1982, that the Secretary withdraw his certification, arguing that MARTA's transit workers no longer enjoyed the continuation of collective bargaining rights as required by section 13(c). The Department of Labor declined to do so, however, stating that it was "unaware of any facts or circumstances which would render the ... 1977 agreement no longer fair and equitable." Letter of Ronald St. Cyr, Deputy Assistant Secretary of Labor, to John W. Rowland, International President, ATU (June 24, 1982), *reprinted in* J.A. 161.

ATU then filed this action, challenging the Secretary's decision not to reconsider the certification. The union contended that the Secretary had violated section 13(c) by certifying an agreement that did not provide for interest arbitration for wage disputes, and that did not permit collective bargaining on five subjects over which the union previously was entitled to bargain. The District Court granted summary judg-

---

**6.** At the time of the parties' agreement, five circuits outside the Eleventh had held that breach of a 13(c) agreement constituted a violation of a federal statute. *Division 587, Amalgamated Transit Union v. Municipality of Metropolitan Seattle,* 663 F.2d 875 (9th Cir.1981); *Local Division 1285, Amalgamated Transit Union v. Jackson Transit Auth.,* 650 F.2d 1379 (6th Cir.1981), *rev'd,* 457 U.S. 15, 102 S.Ct. 2202, 72 L.Ed.2d 639 (1982); *Local Div. 714, Amalgamated Transit Union v. Greater Portland Transit Dist.,* 589 F.2d 1 (1st Cir.1978); *Local Div. 519, Amalgamated Transit Union v. LaCrosse Municipal Transit Util.,* 585 F.2d 1340 (7th Cir.1978); *Division 1287, Amalgamated Transit Union v. Kansas City Area Transportation Auth.,* 582 F.2d 444 (8th Cir.1978), *cert. denied,* 439 U.S. 1090, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979). The Su-

preme Court granted certiorari in *Jackson Transit Authority,* 454 U.S. 1079, 102 S.Ct. 632, 70 L.Ed.2d 613 (1981), to consider the question. Rather than jeopardize MARTA's funding, ATU decided to agree to a certification based on the 1977 agreement, and to challenge the contrary arbitration provisions of Act 1506 as inconsistent with federal law. A decision in *Jackson Transit Authority* upholding the enforceability of 13(c) agreements in federal court under federal law would have overturned the Eleventh Circuit's decision and would have permitted ATU to enforce the 1977 agreement notwithstanding Act 1506, while at the same time preserving MARTA's federal funding. The Court, however, held that 13(c) agreements are enforceable only in state court under state law. 457 U.S. at 29, 102 S.Ct. at 2210.

ment in favor of the Secretary. The trial court concluded that, notwithstanding the Secretary's objection, a section 13(c) certification decision is subject to judicial review, but that the court's inquiry is limited to determining whether that decision is arbitrary or capricious. Applying this standard, the District Court found that the Secretary had reasonably determined that the agreement at issue was fair and equitable, even though it did not contain certain provisions the union desired. In so ruling, the District Court rejected ATU's contention that a 13(c) agreement cannot be certified unless it includes provisions satisfying each of the five specific requirements set out in the statute. 582 F.Supp. at 529–30. This appeal followed.

## II. ANALYSIS

### A. *Judicial Review*

■ Before this court, the Secretary renews his claim that certification decisions are "agency action[s] ... committed to agency discretion by law," and therefore fall within the class of agency decisions shielded from judicial review by the Administrative Procedure Act ("APA"). 5 U.S.C. § 701(a)(2) (1982). This contention, however, is premised on a flawed interpretation of section 13(c) and is inconsistent with settled principles of judicial review of administrative actions.

The Secretary argues that section 13(c) requires nothing more than that he find a given labor protective agreement "fair and equitable," and that this congressional delegation of authority confers upon him such broad discretion that courts are simply without law to apply in reviewing his decisions. This argument proceeds from the notion that the statute's five enumerated subsections including subsection 2, which calls for "the continuation of collective bargaining rights," are merely "general objectives" to guide his determinations, and set forth no precise formulation for determining when labor protective agreements are fair and equitable. As the Secretary reads

the statute, he is free to certify a labor protective agreement that satisfies only two or three of the five "general objectives," as long as he believes that the agreement, taken as a whole, is fair.

The plain language of the statute, however, belies such a reading. Section 13(c) states quite clearly that "[labor] protective arrangements *shall* include, without being limited to, such provisions as may be necessary for ... the continuation of collective bargaining rights." 49 App.U.S.C. § 1609(c) (1982) (emphasis supplied). We fail to see how this language can be read as anything other than mandatory; section 13(c) is drafted as a legislative command, not a delegation of unreviewable discretion.

Indeed, in *Jackson Transit Authority*, the Supreme Court read the statute as setting forth mandatory requirements, not simply general objectives or suggestions. The Court noted that section 13(c) "lists several protective steps that *must* be taken before a local government may receive federal aid; among these [is] the ... continuation of collective-bargaining rights." 457 U.S. at 17–18, 102 S.Ct. at 2204 (emphasis supplied). The Court also stated that "[s]ection 13(c) demands 'fair and equitable arrangements' as prerequisites for federal aid; it requires the approval of the Secretary of Labor for those arrangements; *it specifies five different varieties of protective provisions that must be included among the 13(c) arrangements.*" *Id.* at 23, 102 S.Ct. at 2207 (emphasis supplied). The Court, therefore, has rejected the very interpretation of section 13(c) that the Secretary advances in support of his claim that certification decisions are unreviewable. The statute does not confer limitless discretion on the Secretary to divine what is fair and equitable in the abstract. Rather, it prescribes statutory minima that both circumscribe his discretion and dictate standards for determining the fairness and equity of particular labor protective arrangements.[7]

7. The Secretary cites several cases that characterize certification decisions as unreviewable, but a careful reading reveals that the courts in those cases were presented with fundamentally

In *Heckler v. Chaney*, —— U.S. ——, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), the Court interpreted the APA, 5 U.S.C. § 701(a)(2), as creating only a narrow exception to the general rule of judicial review of agency decisions, thereby reaffirming the strong presumption in favor of such review. In *Chaney*, plaintiffs sought review of the Food and Drug Administration's refusal to take various enforcement actions to prevent the use of unapproved lethal drugs for the execution of prisoners. The Court ruled that decisions not to prosecute or enforce are "generally committed to an agency's absolute discretion" and are therefore not subject to judicial review. *Id.* at 1656. The Court emphasized that the "exception to reviewability provided by § 701(a)(2) ... remains a narrow one," *id.* at 1659, and contrasted refusals to enforce with decisions that involve "an affirmative act of approval under a statute that set[s] clear guidelines for determining when such approval should be given," and are therefore reviewable. *Id.* at 1655. The Court offered, as a prototypical example of reviewable agency action, the decision in-

volved in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). In that case, the Secretary of Transportation approved construction of a highway project through parkland under a statute that permitted such construction only where the Secretary first determined that no feasible alternative existed. The Court found that the statute set out sufficiently clear standards to permit judicial review of agency decisions taken under it, despite the broad discretion that Congress had conferred on the Secretary. *Id.* at 411–13, 91 S.Ct. at 821–22.

A certification decision under section 13(c) of the UMTA clearly falls within the large category of agency decisions that, under *Chaney* and *Overton Park*, remain subject to judicial review. Certification constitutes an affirmative act of approval—unless and until the Secretary determines that a given 13(c) agreement is fair and equitable within the meaning of the statute, no UMTA funds may be disbursed. Moreover, certification decisions are made

different questions than that addressed here. For example, in *Kendler v. Wirtz*, 388 F.2d 381 (3d Cir.1968), the Secretary certified a labor protective agreement that gave reemployment priority to all covered workers who lost their jobs because of a transit project that re-routed some New Jersey Central trains over Pennsylvania Railroad tracks. Section 13(c)(4) calls for priority in the reemployment of covered workers, and the union argued that the labor agreement did not satisfy this requirement because it only gave displaced workers priority for vacancies within the Pennsylvania line, but not the New Jersey Central line. The Third Circuit upheld the Secretary's decision, however, and refused to review a "mere difference of judgment between a person disadvantageously affected by agency action and the responsible head of the agency." *Id.* at 383. The Third Circuit thus adopted a limited scope of review for situations in which the Secretary decides whether or not a specific provision within a labor agreement satisfies one of section 13(c)'s express objectives. *Kendler* says nothing, however, about the scope of review for a case such as this, where the Secretary has certified an agreement because he believes that on the whole it is fair and equitable, even though it does not satisfy an express requirement of section 13(c). Similarly, in *City of Macon v. Marshall*, 439 F.Supp. 1209 (M.D.Ga.1977), the court declined to review the Secretary's decision not to certify a plan in

which the transit authority refused to bargain with or recognize the workers' union. Just as in *Kendler*, where the Secretary found that a certain provision satisfied one of the statute's five goals, so too he may decide that the absence of certain provisions fails to satisfy one of those goals and that certification is improper. In both cases, the Secretary measured the agreements against the statute's express requirements. Neither *Marshall* nor *Kendler*, however, speak to the present situation, where the Secretary has determined that an agreement that does not satisfy all of section 13(c)'s objectives is nevertheless fair and equitable. In essence, this case does not concern the exercise of recognized discretionary authority, but an agency's interpretation of the authority delegated to it. Such interpretations are always subject to judicial review. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, —— U.S. ——, 104 S.Ct. 2778, 2782 n. 9, 81 L.Ed.2d 694 (1984) ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent."); *SEC v. Sloan*, 436 U.S. 103, 118, 98 S.Ct. 1702, 1711, 56 L.Ed.2d 148 (1978) (" '[C]ourts are the final authorities on issues of statutory construction.' ") (quoting *Volkswagenwerk Aktiengesellschaft v. Federal Maritime Comm'n*, 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1967)).

under a statute that sets out clear guidelines for determining when such approval is to be given. Indeed, section 13(c), with its five express requirements, sets out far more precise standards than the statute at issue in *Overton Park*, which simply prohibited the Secretary of Transportation from approving any project using parkland unless he determined that no "feasible" alternatives existed. 401 U.S. at 411, 91 S.Ct. at 821.

In short, the plain language of the statute, as well as the Supreme Court's decision in *Chaney*, demonstrate that the Secretary's claim of unreviewability is simply untenable. The District Court correctly ruled that certification decisions are subject to judicial review.

### B. *The Continuation of Collective Bargaining Rights*

#### 1. *Mandatory or permissive?*

■ Having concluded that the Secretary's decisions may be reviewed by the courts, the District Court adopted an abuse of discretion standard for purposes of judging such decisions. The District Court believed that, under section 13(c), the Secretary is only required to "scrutinize [a labor] agreement *as a whole* to ensure that it is fair and reasonable." 582 F.Supp. at 529 (emphasis supplied). We disagree. This reading of the statute is essentially the same as that advanced by the Secretary in support of his contention that certification decisions are completely unreviewable; it rests on the premise that the five enumerated subsections of 13(c) are simply statutory suggestions rather than legal standards that govern the Secretary's certification decisions. As we have already observed, section 13(c) is written in mandatory terms, and the Supreme Court has so interpreted it. The Secretary is not free to certify a labor agreement that does not provide for the continuation of collective bargaining rights simply because he believes that, on balance, the agreement is fair. Rather, he must first determine that the requirements of the statute are fully

satisfied *before* he can find an agreement "fair and equitable."

This construction of the statute is compelled not only by its plain language, but by its legislative history as well. As originally drafted, section 13(c)(2) would have required only the *encouragement* of the continuation of collective bargaining rights. *See* H.R.Rep. No. 204, 88th Cong., 1st Sess. 20 (1963), *reprinted in* 1964 U.S.Code Cong. & Ad.News 2569, 2589. Secretary of Labor Wirtz, who presented the administration's version of section 13(c) to Congress, testified that the statute was drafted with the need for "flexibility" in mind, and that it would not require the Secretary to withhold certification even where a state's laws prohibited collective bargaining altogether. *Urban Mass Transportation Act of 1963: Hearings on H.R. 3881 Before the House Comm. on Banking and Currency*, 88th Cong., 1st Sess. 482–83 (1963) ("*House Hearings*"). Congress, however, was not content to entrust the protection of collective bargaining rights to the absolute discretion of the Secretary of Labor. The Senate dropped the "encouragement" language at the urging of Senator Morse, who insisted that "encouragement" was too vague a standard and afforded little, if any, protection to unionized workers. 109 Cong.Rec. 5675 (1963). Noting that the original bill " 'encourages' the maintenance of the status quo, but ... does not require it," *id.*, the Senator successfully introduced an amendment calling for "the continuation of collective bargaining rights." Senator Morse could not have been clearer about the purpose of his amendment:

> The question of policy is this: Should the Federal Government make available to cities, States and local governmental units Federal money to be used to strengthen their mass transit system ... when the use of that money would result in lessening the collective bargaining rights of existing unions?
>
> ....
>
> ... [I]t is my underlying thesis as I press for the adoption of the amendment: That is, we ought to maintain the status quo.

.  .  .  .

*. . . If you have collective bargaining now, I think the bill ought to be so drawn that you will be assured of a continuance of collective bargaining, so far as the Federal Government is concerned.*

*Id.* at 5671–72 (emphasis supplied).

There can be little doubt as to the effect of the Morse amendment: by adopting it, Congress meant to *require* the continuation of collective bargaining rights, not merely to recommend such a continuation. Whatever discretion the Secretary may have under section 13(c), it does not include the discretion to ignore the statute's requirements and certify a labor agreement that does not provide for the continuation of collective bargaining rights.

The District Court reached its contrary conclusion because it believed that Congress did not intend to impose federal labor policy on the states. 582 F.Supp. at 530. However, this argument misconceives the operation of the statute. Under section 13(c), states remain free to adopt any constitutionally permissible public sector collective bargaining law they choose. Nothing in UMTA pre-empts this authority, nor do section 13(c) or the labor agreements created under it override state law. *See Jackson Transit Authority*, 457 U.S. at 27, 102 S.Ct. at 2209 (section 13(c) does not supersede state law); *Local Division 589, Amalgamated Transit Union v. Massachusetts*, 666 F.2d 618, 627 (1st Cir.1981) ("Congress intended state law, not § 13(c)

assurances, to prevail in case of a conflict"), *cert. denied*, 457 U.S. 1117, 102 S.Ct. 2928, 73 L.Ed.2d 1329 (1982). But as the Supreme Court recognized in *Jackson Transit Authority*, states have no automatic entitlement to federal funding for their transit systems, and must satisfy section 13(c) if they desire such assistance. The Court made it abundantly clear that labor protective agreements are to be the product of local laws and local bargaining, but that section 13(c) governs a state's right to federal funding.

> Congress intended that § 13(c) would be an important tool to protect the collective-bargaining rights of transit workers, *by ensuring that state law preserved their rights before federal aid could be used to convert private companies into public entities.*

457 U.S. at 27–28, 102 S.Ct. at 2209 (emphasis supplied).[8]

Section 13(c) does not prescribe mandatory labor standards for the states, but rather dictates the terms of federal mass transit assistance. States are free to forego such assistance and thus to adopt any collective bargaining scheme they desire; the mandatory language of section 13(c) in no way alters this prerogative. But the statute does not allow states to eliminate collective bargaining rights and still enjoy federal aid. Section 13(c) prevents such a result by prohibiting the Secretary from certifying labor agreements that do not provide for the continuation of collective bargaining rights.[9]

---

**8.** The Court reiterated this theme throughout its opinion. At the outset, it noted that "a state or local government must make arrangements to preserve transit workers' existing collective-bargaining rights before that government may receive federal financial assistance." 457 U.S. at 16, 102 S.Ct. at 2203. Later, the Court stated that Congress included § 13(c) "[t]o prevent federal funds from being used to destroy the collective-bargaining rights of organized workers." *Id.* at 17, 102 S.Ct. at 2204. Elsewhere, the Court summarized Senate debate as "reflect[ing] a congressional intent that the Federal Government be able to seek changes in state law and ultimately to refuse financial assistance when state law prevented compliance with § 13(c)." *Id.* at 25 n. 8, 102 S.Ct. at 2208 n. 8. Finally, the

Court discussed the effect of Senator Morse's amendment to § 13(c), which deleted the "encouragement" language, noting that "these alterations in the bill demonstrate only that Congress demanded that the Secretary ensure that state law preserved collective-bargaining rights before he provided federal aid for acquisition of a private transit company." *Id.* at 28 n. 10, 102 S.Ct. at 2209 n. 10.

**9.** This construction of the statute is consistent with the First Circuit's decision in *Local Division 589 v. Massachusetts*, 666 F.2d 618, upon which both the Secretary and District Court relied for their contrary interpretation. The question before the First Circuit was not whether § 13(c) sets out mandatory minima or horta-

## 2. *Federally Defined Rights*

In order to decide whether Act 1506 prevents MARTA from satisfying the requirements of section 13(c), we must first determine what "the continuation of collective bargaining rights" requires. The Secretary argues that state law must be the guiding star for defining "collective bargaining rights." Adoption of a federal standard, he contends, would effectively require state and local governments to waive their exclusion from the NLRA, and would give federal labor policy primacy over state law, contrary to Congress' intent. The legislative history behind section 13(c), however, reveals that Congress did indeed adopt a federal standard for measuring the "continuation of collective bargaining rights" under UMTA.

As we noted earlier, Senator Morse was quite explicit about the purpose and effect of his amendment. By deleting the "encouragement" language from section 13(c), the amendment was designed to preserve the status quo such that, where workers enjoyed collective bargaining rights prior to a state's acquisition of a transit system with federal money, those workers were to be "assured of a continuance of collective bargaining." 109 Cong.Rec. 5672 (1963). Maintaining the status quo usually meant substantially preserving collective bargaining rights that had been established by federal labor policy. Senator Morse addressed this issue when he discussed the consequences of a state's decision to adopt labor laws not in conformity with federal labor policies.

> What we have in that situation ... is a conflict between a sound Federal public policy and a policy of a State. The State can continue its State policy if it wishes to; but in [my] judgment ... the State should not be allowed to receive Federal money with which to continue a policy that is in conflict with sound Federal policy.

*Id.* at 5672.

The bill's opponents also understood that principal points of federal labor policy often would govern a state's entitlement to federal funds under section 13(c). In both houses, members introduced amendments that would have required the continuation of collective bargaining rights only to the extent not inconsistent with state law. Congress rebuffed these efforts. *See* 109 Cong.Rec. 5422 (1963); *id.* at 5582, *id.* at 5684; 110 Cong.Rec. 14979–80 (1964). Passage of these amendments would have demonstrated Congress' willingness to permit state laws to provide the substantive meaning of "collective bargaining rights." Their defeat, however, "reflected a congressional intent that the Federal Government be able to seek changes in state law and ultimately to refuse financial assistance when state law prevented compliance with § 13(c)." *Jackson Transit Authority,* 457 U.S. at 25 n. 8, 102 S.Ct. at 2208 n. 8.

The legislative history, therefore, reveals Congress' clear intent to measure state labor laws against the standards of collective bargaining established by federal labor policy. The Secretary's contrary construction of section 13(c) would produce a meaningless tautology: if state law defines the "collective bargaining rights" that must be continued under the federal statute, then a public transit authority's labor relations always will be in compliance with section 13(c), because by definition a state transit authority will be in conformity with state law. Congress clearly did not envision section 13(c)(2) operating in such a fashion.

---

tory suggestions, but rather whether § 13(c) agreements are binding on states and override contrary state law. In concluding that § 13(c) agreements do not supersede state law, the court noted that

> § 13(c) assurances need not override state law to make § 13(c) enforceable. The threat of receiving no further UMTA funds would often prevent a state currently receiving those funds

from changing its laws contrary to the policy of 13(c). If not, the Secretary might halt the flow of funds or take other appropriate action.

*Id.* at 634. We decide today the question the First Circuit did not reach, and hold that where a state, through its laws or otherwise, fails to satisfy the requirements of § 13(c), the Secretary must cut off funds by denying certification.

On the other hand, by passing section 13(c), Congress did not intend to subject local government employers to the precise strictures of the NLRA. The exclusion of local governments from the coverage of that Act, *see* 29 U.S.C. § 152(2) (1982), was to remain intact. During Senate debate on the Morse amendment, Senator Goldwater specifically asked if section 13(c) would be inconsistent with the NLRA exclusion. 109 Cong.Rec. 5674 (1963). Senator Morse assured him it would not. The language of the bill, Senator Morse stated, "make[s] it clear that the Taft-Hartley exemptions are not changed by the amendment." *Id.* In *Jackson Transit Authority*, the Supreme Court reviewed this legislative history and concluded that "[s]ection 13(c) evinces no congressional intent to upset the decision in the National Labor Relations Act to permit state law to govern the relationships between local governmental entities and the unions representing their employees." 457 U.S. at 23–24, 102 S.Ct. at 2207.

Thus, Congress neither imposed upon the states the precise definition of "collective bargaining" established by the NLRA and the case law that has developed under that Act, nor did it employ a term of art devoid of all meaning, leaving the states free to interpret and define it as they saw fit. Instead, Congress used the phrase generically, incorporating within the statute the commonly understood meaning of "collective bargaining." The 1964 Congress was not writing on a clean slate. Then as now, collective bargaining was universally understood to require, at a minimum, *good faith* negotiations, to a point of impasse, if necessary, over wages, hours and other terms and conditions of employment.

> [T]he duty to bargain in good faith is an "obligation ... to participate actively in the deliberations so as to indicate a present intention to find a basis for

agreement...." Not only must the employer have "an open mind and a sincere desire to reach an agreement" but "a sincere effort must be made to reach a common ground."

Cox, *The Duty to Bargain in Good Faith,* 71 HARV.L.REV. 1401, 1415 (1958) (quoting *NLRB v. Montgomery Ward & Co.,* 133 F.2d 676, 686 (9th Cir.1943)).

These precepts have long been the bedrock of collective bargaining in the federally-regulated private sector. *See* NLRA § 8(d), 29 U.S.C. § 158(d) (1982); *Local Union No. 189, Amalgamated Meat Cutters v. Jewel Tea Co.,* 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965) (plurality opinion) (particular hours of day and days of week employees work are mandatory subjects of collective bargaining); *Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 222, 85 S.Ct. 398, 409, 13 L.Ed.2d 233 (1964) (Stewart, J., concurring) (amount of work, periods of relief, and safety practices are conditions and terms of employment); *NLRB v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962) (violation of duty to bargain for employer to grant merit increases and change sick leave policy during contract negotiations with union before agreement or bargaining impasse has been reached); *NLRB v. Wooster Div. of Borg-Warner Corp.,* 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958) (defining "mandatory" subjects of bargaining). Likewise, the foregoing principles have provided the common denominator of the public sector collective bargaining schemes enacted by the states. Indeed, approximately thirty states have adopted collective bargaining statutes covering some or all categories of public employees, and, while they vary in many respects, all provide for good faith bargaining over wages, hours and other terms and conditions of employment.[10]

---

10. Aiaska, ALASKA STAT. § 23.40.250 (1984) (wages, hours and other terms and conditions of employment for all public employees except school teachers); California, CAL.GOVERNMENT CODE §§ 3504, 3516, 3529 (West 1980) (wages, hours and other terms and conditions of employment for all public employees); Connecticut, CONN.GEN.STAT.ANN. §§ 5–271, 7–468, 10–153a

(West 1977 & Supp.1985) (wages, hours and other conditions for state employees, municipal employees and teachers); Delaware, DEL.CODE ANN. tit. 2, § 1613 (1975), tit. 14, § 4002 (Supp. 1984), tit. 19, § 1301 (1979) (wages, salaries, hours, and other terms and conditions of employment for transportation workers, school teachers and public employees); Florida, FLA.

In sum, Congress struck a delicate balance in section 13(c). The statute provides that state law should govern the labor relations of public transit authorities and their employees, but it conditions federal transit aid, in part, on the continuation of collective bargaining rights. In setting out those rights, Congress chose not to incorporate the entire structure and requirements of the NLRA into section 13(c), for to do so would force states to choose between federal transit aid and their exclusion from the coverage of the NLRA. On the other hand, Congress made it clear that federal labor policy would dictate the substantive meaning of collective bargaining for purposes of section 13(c). "Good faith" bargaining, to a point of impasse if necessary, over wages, hours and other terms and conditions of employment has always been the essence of federally-defined collective

STAT.ANN. § 447.309 (West 1981) (wages, hours, and terms and conditions of employment for all public employees); Hawaii, HAWAII REV.STAT. § 89-3 (1976) (wages, hours and other terms and conditions of employment for all public employees); Idaho, IDAHO CODE § 44–1802 (1977) (wages, rates of pay, working conditions and all other terms and conditions of employment for firefighters); Illinois, ILL.ANN.STAT. ch. 48, §§ 1603, 1606, 1607, 1710 (Smith & Hurd Supp. 1985) (wages, hours and other conditions of employment for all public employees and school teachers); Iowa, IOWA CODE ANN. § 20.9 (West 1978) (wages, hours, vacations, insurance, holidays, leaves of absence, shift differentials, overtime, supplemental pay, seniority, transfers, job classifications, health and safety matters, evaluation procedures, in-service training procedures and staff reductions for all public employees); Kansas, KAN.STAT.ANN. § 75–4322 (1984) (salaries, wages, hours, vacations, sick leave, holidays, retirement and insurance benefits, overtime, shift differentials and grievances for all public employees, except school teachers); Maine, ME.REV.STAT.ANN. tit. 26, §§ 965, 979–D, 1026, 1285 (1974 & Supp.1984–85) (wages, hours, working conditions and contract grievance arbitration for municipal, county, state, university and judicial employees); Massachusetts, MASS.GEN.LAWS ANN. ch. 150E, § 6 (West 1982) (wages, hours, standards of productivity and performance, and any other terms and conditions of employment for state, county and municipal employees); Michigan, MICH.COMP. LAWS §§ 423.211, 423.215 (1978) (wages, hours and other terms and conditions of employment for all public employees except classified state employees); Minnesota, MINN.STAT.ANN. §§ 179A.05–179A.07 (West Supp.1985) (terms and conditions of employment for all public employees); Montana, MONT.CODE ANN. § 39–31–305 (1983) (wages, hours, fringe benefits, and other conditions of employment for all public employees); Nebraska, NEB.REV.STAT. § 48–837 (1984) (terms and conditions of employment for all public employees except municipal employees); Nevada, NEV.REV.STAT. § 288.033 (1983) (wages, hours and other terms and conditions of employment for local government employees, teachers and state nurses); New Hampshire, N.H. REV.STAT.ANN. § 273–A:1 (1978) (wages, hours and other conditions of employment for all public employees); New Jersey, N.J. STAT. ANN. § 34:13A–5.3 (West Supp.1984) (terms and conditions of employment for all public employees); New York, N.Y. CIVIL SERVICE LAW §§ 201, 203 (McKinney 1983) (salaries, wages, hours and other terms and conditions for most public employees); North Dakota, N.D. CENT.CODE § 15–38.1–09 (1981) (salary, hours and other terms and conditions of employment for teachers); Ohio, OHIO REV.CODE ANN. § 4117.03 (Page Supp.1984) (wages, hours, terms and other conditions of employment for all state employees except members of organized militia); Oklahoma, OKLA.STAT.ANN. tit. 11, § 51–102 (1978) (wages, hours and other conditions of employment for firefighters and police); Oregon, OR. REV.STAT. § 243.650 (1983) (direct or indirect monetary benefits, hours, vacations, sick leave, grievance procedures and other conditions of employment); Pennsylvania, 43 PA.CONS.STAT. § 1101.701 (Supp.1985) (wages, hours and other terms and conditions of employment for all public employees); Rhode Island, R.I.GEN.LAWS §§ 28–9.1–4, .2–4, .3–2, .4–3 (1979 & Supp.1984), § 36–11–1 (1984) (hours, salary, working conditions and all other terms and conditions of employment for state and municipal employees, teachers, firefighters and police); South Dakota, S.D. CODIFIED LAWS ANN. § 3–18–2 (1980) (grievance procedures and conditions of employment for all public employees); Vermont, VT.STAT.ANN. tit. 3, § 904, (Supp.1984) (wages, hours, working conditions, overtime, leave, reduction-in-force procedures, grievance procedures, insurance and personnel regulations for state employees), tit. 16, § 2004 (1982) (salary, economic conditions, and grievance procedures for teachers), tit. 21, § 1725 (1978) (wages, hours and conditions of employment for municipal employees); Washington, WASH.REV.CODE ANN. §§ 41.56.030, 41.59.020 (Supp.1985) (wages, hours and working conditions for public employees and teachers); and Wisconsin, WIS.STAT.ANN. §§ 111.70, 111.91 (West Supp.1984) (wages, hours and conditions of employment for state and municipal employees). See also ADVISORY COMMISSION ON INTERGOVERNMENTAL RELATIONS, LABOR-MANAGEMENT POLICIES FOR STATE AND LOCAL GOVERNMENTS 102–03 (1969) (state statutes should set out management rights, but "[w]ages, hours and other terms and conditions of employment ... [should be] left for the conference table.").

bargaining rights; indeed, excluding the federal sector, it is the almost universally recognized definition of collective bargaining in the United States.

■ Section 13(c)'s requirement, therefore, that labor protective agreements provide for "the continuation of collective bargaining rights" means, at a minimum, that where employees enjoyed collective bargaining rights prior to public acquisition of the transit system, they are entitled to be represented in meaningful, "good faith" negotiations with their employer over wages, hours and other terms and conditions of employment. Collective bargaining does not exist if an employer retains the power to establish wages, hours and other conditions of employment without the consent of the union or without at least first bargaining in good faith to impasse over disputed mandatory subjects. It is against this standard that we must measure Act 1506 and MARTA's labor protective agreement.

### 3. Act 1506 and Collective Bargaining

When the Georgia legislature passed Act 1506 in 1982, the new law altered in several material respects the existing statutory authorization of MARTA to engage in collective bargaining. First, Act 1506 provided that collective bargaining could not impair "the inherent management rights of the Authority," including but not limited to,

    (1) the right to assign employees, respecting rights of seniority;

    (2) the right to discharge employees for just cause;

    (3) the right to subcontract service, other than for the operation of rail or bus vehicles, provided no employees are laid off;

    (4) the right to hire part-time employees, for no more than 25 hours per week, without payment of fringe benefits; and

    (5) the right to establish the number of regular hours that may be worked in a week, not to exceed 40 hours, and to fix the number of overtime hours, not to exceed 10 hours per week.

Act 1506 § 3(b)(2)(A)–(B), (E)–(G), 1982 Ga. Laws at 5105. The effect of these statutory provisions was to remove the foregoing subjects from the scope of bargaining.

Second, the 1982 Georgia law also changed the procedures for the referral of bargaining disputes to interest arbitration. Act 1506 now requires that, before bargaining disputes may be resolved in binding interest arbitration, they must first be submitted to a neutral fact-finder "to explore the issues and render a report to the Authority, the authorized representative concerned, and the public." The fact-finder's report "shall recommend appropriate wages, hours and working conditions," but it is not binding on the parties. Act 1506 § 3(b)(5), 1982 Ga.Laws at 5106–07.

Third, the 1982 statute significantly amended the pre-existing law by providing that issues concerning wages may not be submitted to binding interest arbitration except upon the consent of both parties. Act 1506 § 3(b)(2), 1982 Ga.Laws at 5104. Thus, unless the employer agrees to accept the fact-finder's recommendations or consents to interest arbitration, MARTA retains the power to fix wages. Indeed, although Act 1506 requires bargaining over wages for at least 60 days after expiration of a labor agreement, id., it does not specify that negotiations must be conducted in "good faith" to a point of impasse. However, it is our interpretation that section 13(c) does so require. If it were otherwise, 15 days following the issuance of the fact-finder's report, MARTA could fix wages as it saw fit, id.,[11] without any preceding requirements of "good faith" negotiations or a bargaining impasse.

It is obvious that several of these provisions are completely antithetical to the con-

---

**11.** The statute provides that parties must engage in bargaining for 60 days after the expiration of a contract. Act 1506 § 3(b)(2), 1982 Ga.Laws at 5104. It then provides for fact-finding with respect to unresolved issues, presumably including wages. Id. § 3(b)(2) and (5), 1982 Ga.Laws at 5104, 5106–07. Since wages are excluded from binding arbitration unless both parties consent, it is clear that MARTA may act unilaterally with regard to wages following fact-finding.

cept of collective bargaining embodied in section 13(c). Fringe benefits clearly fall within the compass of "wages," and are therefore subjects over which employers and employees must bargain.[12] Act 1506, however, bars MARTA from negotiating over these benefits with respect to part-time employees, and thereby prevents the continuation of collective bargaining over wages that section 13(c) mandates. Similarly, the number of regular hours and the amount of overtime an employee can work are universally recognized as mandatory subjects of collective bargaining.[13] Yet Act 1506 forecloses negotiations on these subjects and permits MARTA to establish work hours and overtime by management

fiat.[14] In addition, Act 1506 gives MARTA unilateral control over promotions and work assignments. While several states have passed statutes that include such subjects within the scope of nonnegotiable management rights,[15] work assignments and promotions have generally been recognized as terms and conditions of employment over which workers and employees must collectively bargain.[16] Thus, Act 1506's reservation of this right to MARTA's exclusive control may be considered as possibly inconsistent with the continuation of collective bargaining rights required by section 13(c).

■ Act 1506 also bars MARTA from bargaining over subcontracting decisions.

12. See, e.g., NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962) (accumulation of sick leave is mandatory subject); Richfield Oil Corp. v. NLRB, 231 F.2d 717 (D.C.Cir.) (stock purchase plan can be mandatory subject), cert. denied, 351 U.S. 909, 76 S.Ct. 695, 100 L.Ed. 1444 (1956); NLRB v. Black-Clawson Co., 210 F.2d 523 (6th Cir.1954) (profit sharing plans are "wages"); W.W. Cross & Co. v. NLRB, 174 F.2d 875 (1st Cir.1949) (group health insurance classified as "wages"); Singer Mfg. Co. v. NLRB, 119 F.2d 131 (7th Cir.) (paid holidays and vacations mandatory subjects), cert. denied, 313 U.S. 595, 61 S.Ct. 1119, 85 L.Ed. 1549 (1941); Detroit Police Officers Ass'n v. City of Detroit, 391 Mich. 44, 214 N.W.2d 803 (1974) (pensions are mandatory subject); see also discussion of cases contained in LABOR RELATIONS LAW IN THE PUBLIC SECTOR, Ch. 4, The Obligation and Duty to Bargain (H. Edwards, T. Clark & C. Craver 2d ed. 1979 & 3rd ed. forthcoming 1985).

13. See Local Union No. 189, Amalgamated Meat Cutters v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965) (particular hours of day and days of week employees required to work within the realm of "hours"); Gallenkamp Stores Co. v. NLRB, 402 F.2d 525, 529 n. 4 (9th Cir.1968) (work hours and work days are mandatory subjects); see also supra note 10 (of the thirty state statutory collective bargaining systems, all but five expressly include "hours" as a mandatory subject).

14. In the area of public education, some state courts have held that the length of the school day and school calendar is a matter of educational policy and is therefore not a mandatory subject. See, e.g., City of Biddeford v. Biddeford Teachers Ass'n, 304 A.2d 387 (Me.1973); Burlington County College Faculty Ass'n v. Board of Trustees, 64 N.J. 10, 311 A.2d 733 (1973); West Hartford Education Ass'n v. DeCourcy, 162

Conn. 566, 295 A.2d 526 (1972). See also ME. REV.STAT. tit. 26, § 965(1)(c) (1975) (codifying result of City of Biddeford and excluding "educational policies" from scope of mandatory negotiations). Other states have held that the length of the school year is a mandatory subject. See Joint School District No. 8 v. Wisconsin Employment Relations Board, 37 Wis.2d 483, 155 N.W.2d 78 (1967); see also cases discussed in LABOR RELATIONS LAW IN THE PUBLIC SECTOR, ch. 4, supra note 12.

15. See HAWAII REV.STAT. § 89–9(d)(1) & (2) (Supp. 1984); KAN.STAT.ANN. § 75–4326 (1984); MINN. STAT.ANN. § 179A.07 (West Supp.1985); NEV.REV. STAT. § 288.150(3) (1983); N.H.REV.STAT.ANN. § 273–A:1 (1978); OHIO REV.CODE ANN. § 4117.08 (Page Supp.1984).

16. See, e.g., Fibreboard Paper Products, 379 U.S. at 222, 85 S.Ct. at 409 (Stewart, J., concurring) (amount of work expected during hours is condition of employment); Charmer Indus., 250 N.L.R.B. 293 (1980) (work assignment is mandatory subject), enforcement denied on other grounds, 664 F.2d 318 (2d Cir.1981), cert. denied, 456 U.S. 973, 102 S.Ct. 2236, 72 L.Ed.2d 847 (1982); Beacon Piece Dyeing & Finishing Co., 121 N.L.R.B. 953 (1958) (workload is mandatory subject); United States v. Gypsum Co., 94 N.L. R.B. 112 (1951) (recognizing seniority, promotions, and transfers as mandatory subjects), modified, 206 F.2d 410 (5th Cir.1953), cert. denied, 347 U.S. 912, 74 S.Ct. 475, 98 L.Ed. 1068 (1954); Fire Fighters Union, Local 1186 v. City of Vallejo, 12 Cal.3d 608, 526 P.2d 971, 116 Cal. Rptr. 507 (1974) (vacancies and promotions are mandatory subjects); Los Angeles County Employees Ass'n, Local 660 v. County of Los Angeles, 33 Cal.App.3d 1, 108 Cal.Rptr. 625 (1973) (caseload of welfare eligibility workers is mandatory subject).

In *Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), the Supreme Court made clear that, in the private sector at least, such decisions are mandatory subjects of collective bargaining. Many state courts and boards have followed the Court's lead, and have held that where subcontracting affects bargaining unit employees, it is a subject over which labor and management must bargain.[17] This practice, however, is not without exceptions, and several state courts and boards have concluded that decisions concerning subcontracting are matters of managerial prerogative, and are not negotiable despite their impact on employees.[18] We need not decide whether subcontracting is a mandatory subject of collective bargaining for purposes of section 13(c), however, in order to decide this case. Act 1506 prevents collective bargaining over fringe benefits, hours, overtime, work assignments and promotions, and therefore does not provide for the continuation of meaningful bargaining over wages, hours and other conditions of employment that section 13(c) requires.[19] Since Act 1506 prevents compliance with an express provision of section 13(c), the Secretary's certification of MARTA's labor protective agreement was improper.

■ In so ruling, we wish to make clear that section 13(c)'s requirement that collective bargaining rights be continued does not in any way dictate the substantive provisions of a collective bargaining agreement. The District Court, in upholding the Secretary's certification, stated that it "would be contorting the legislative history to declare that the collective bargaining agreements must have exactly the same, or effectively the same provisions they had over 11 years ago." 582 F.Supp. at 531. We do not understand ATU to argue for such a result, however, nor do we adopt such a construction of the statute. Section 13(c) does not perpetuate the *substantive* terms of pre-acquisition bargaining agreements, but rather protects the *process* of collective bargaining. The substantive provisions of collective bargaining agreements may change, but section 13(c) requires that the changes be brought about through collective bargaining, not by state fiat.

### 4. Interest Arbitration and Collective Bargaining

ATU advances an additional ground for invalidating the Secretary's certification: because Georgia law prohibits strikes by public employees, and because Act 1506 provides for binding arbitration over wage disputes only if MARTA consents, MARTA may unilaterally set wages. Thus, ATU argues, Act 1506 further deprives bargaining unit employees of the continuation of collective bargaining rights by giving them no real voice on a subject that is universally acknowledged to lie at the heart of collective bargaining.

In the private sector, collective bargaining is thought to work because each side has economic weapons at its disposal—in the case of a union, that weapon is the right to strike. While Congress made it clear that section 13(c) would not protect

17. *See, e.g., Unified School Dist. 1 v. WERC,* 81 Wis.2d 89, 259 N.W.2d 724 (1977); see also cases discussed in LABOR RELATIONS LAW IN THE PUBLIC SECTOR, ch. 4, *supra* note 12.

18. *See, e.g., Local 195, IFPTE v. State of New Jersey,* 176 N.J.Super. 85, 422 A.2d 424 (1980), *aff'd in relevant part,* 88 N.J. 393, 443 A.2d 187 (1982); see also cases discussed in LABOR RELATIONS LAW IN THE PUBLIC SECTOR, ch. 4, *supra* note 12.

19. MARTA asserts that the right to discharge employees for cause is not inconsistent with either the collective bargaining statutes typically employed in the public sector, or the scope of collective bargaining in the federally-regulated private sector. Since Act 1506, as we read it, in no way precludes ATU from negotiating over a discharge in any individual case, or from bargaining over the meaning of "just cause," or from arbitrating grievance disputes concerning employee dismissals, we can find no material inconsistency between Act 1506 and the continuation of collective bargaining on the point of discharges for cause. *See National Licorice Co. v. NLRB,* 309 U.S. 350, 360, 60 S.Ct. 569, 575, 84 L.Ed. 799 (1940) (employer's negotiations with individual employees rather than union over meaning of just cause violated employees' right to bargain collectively).

the right of unionized workers to strike, *see, e.g.,* 109 Cong.Rec. 5672 (1963), ATU contends that loss of this weapon must be recompensed with some compulsory mechanism for resolving bargaining disputes over wages. Otherwise, it is claimed, the employer will have unfettered power to set wages unilaterally, which is the antithesis of collective bargaining.

In response, the Secretary argues that the adversarial character of collective bargaining in the private sector is not an immutable law of nature, but rather a creature of the NLRA. *See NLRB v. Insurance Agents International Union,* 361 U.S. 477, 489, 80 S.Ct. 419, 427, 4 L.Ed.2d 454 (1960) (present system of economic weapons is part and parcel of system created by Wagner and Taft-Hartley Acts). Congress was aware that public acquisition of transit companies would result in the loss of transit workers' rights to strike, but it neither prevented that loss nor required the substitution of interest arbitration in its stead. *See Local Division 1285, Amalgamated Transit Union v. Jackson Transit Authority,* 650 F.2d 1379, 1392 (6th Cir. 1981) ("Section 13(c) does not require protection of interest arbitration"), *rev'd on other grounds,* 457 U.S. 15, 102 S.Ct. 2202, 72 L.Ed.2d 639 (1982); *Local Division No. 714, Amalgamated Transit Union v. Greater Portland Transit District,* 589 F.2d 1, 6–7 (1st Cir.1978) (statute does not command that interest arbitration be provided), *overruled in part on other grounds, Local Division 589, Amalgamated Transit Union v. Massachusetts,* 666 F.2d 618 (1st Cir.1981), *cert. denied,* 457 U.S. 1117, 102 S.Ct. 2928, 73 L.Ed.2d 1329 (1982). Thus, in the private sector, Congress provided for the use of economic weapons, but it made no such provision in the public sector, nor did it condition certification on the presence of interest arbitration.

■ The Secretary's argument, however, proves too much. While it is true that Congress neither protected the right to strike nor required interest arbitration as a condition of federal transit aid, it is inconceivable that a system that allows an employer to set wages unilaterally is consistent with the continuation of collective bargaining rights required by section 13(c). We hold that while section 13(c) does not entitle transit workers to any particular form of binding arbitration, it does require some process that avoids unilateral control by an employer over mandatory subjects of collective bargaining.

Unfortunately, the application of these principles in the instant case is anything but clear. First, although Act 1506 mandates that the parties bargain "in the same manner and to the same extent as if [the Authority's employees] were the employees of any privately owned transportation system," much of the rest of Act 1506 is inconsistent with collective bargaining in the private sector. The general statutory mandate, standing alone, would seem to require "good faith" negotiations to a point of impasse; however, in light of the several statutory exclusions from the scope of bargaining, one cannot be sure whether the Georgia law even requires "good faith" bargaining over those matters that are subject to negotiations. The statute appears silent on the question and we have been referred to no state judicial decisions indicating an enforceable duty to bargain. Thus, ATU's claim that MARTA retains what amounts to unfettered control over wages has some force.

Second, ATU contends that "[i]t is not ... the absence of interest arbitration which is the fatal impediment to certification. It is, rather, the absence of *any* mechanism to replace unilateral employer power which requires setting aside the Secretary of Labor's certification." Appellant's Reply Brief at 11–12 (emphasis in original). The problem with this argument is that it ends up being circular, leading to no apparent conclusion. ATU concedes that binding interest arbitration is not compelled by UMTA, and yet, so far as we can tell, the Union can point to no alternative to strikes other than binding interest arbitration.

Third, our reading of Act 1506 suggests that any unresolved issues over wages *must* be submitted to fact-finding. However, ATU asserts that fact-finding "is part of the wholly *voluntary* interest arbitration process and is thus available only if MARTA consents." *Id.* at 944 n. 7 (emphasis in original). If ATU is correct, then it would appear that MARTA retains full power to set wages as it sees fit, especially if there is no requirement of "good faith" bargaining to a point of impasse. However, if *meaningful* fact-finding is a mandatory process to aid in the resolution of wage disputes, then there may indeed be a legitimate alternative to unilateral employer power. Unfortunately, on the record before us, we have no way of knowing either whether wage issues must be submitted to fact-finding or, if so, whether the fact-finding process is a fair and equitable mechanism for the resolution of bargaining disputes.

Under UMTA, Congress has made it clear that the right to strike is not to be preserved pursuant to federal law and that binding interest arbitration will not be required. Yet, Congress has mandated the continuation of collective bargaining. In these circumstances, we reject the Union's implicit suggestion that fact-finding in any form is inadequate if neither side is bound to abide by the fact-finder's conclusions. It simply does not follow that, under the curious scheme of UMTA, there can be no meaningful bargaining without the potential of a forced agreement pursuant to some neutral authority. Indeed, quite apart from the limitations inherent in UMTA, it is very difficult to know what, if anything, is an effective substitute for the right to strike. In many bargaining situations, a threat of strike may be meaningless, depending upon the economics involved, the staying power of the parties, the essentiality of the employees' work, public support for the parties, and the availability of alternative sources of labor or production. Given this reality, ATU is off-the-mark in contending that nonbinding fact-finding *always* will be an inadequate substitute for the right to strike.

If the fact-finding process is mandated in such a way as to ensure a full and fair airing of the parties' issues, and to ensure fully informed and fair recommendations for settlement, an employer may be hard-pressed to reject the fact-finder's proposed judgment. The net result of this process could be a settlement that is more equitable than one that might be reached pursuant to a threat or exercise of a right to strike. In short, we believe that mandatory fact-finding with recommendations, preceded by "good faith" bargaining to a point of impasse, conceivably may be a legitimate mechanism to replace unilateral employer power to fix wages.

As of October, 1984, approximately thirty-five states had authorized some form of fact-finding, at the request of either party, for the resolution of bargaining disputes. *See Dispute Settlement in the Public Sector: The State-of-the-Art, Report to Department of Labor, Division of Public Employment Relations Services* 8–15 (T. Gilroy & A. Sinicropi eds. 1971) *reprinted and updated in Labor Relations Law in the Public Sector* (H. Edwards, T. Clark & C. Craver 2d ed. 1979 & 3rd ed. forthcoming 1985). These systems, of course, vary among, and often within the states, and we express no view concerning the extent to which they satisfy the requirements of section 13(c). They simply illustrate mechanisms for dispute resolution. Any system that the Georgia legislature may ultimately choose to adopt, however, will of course be measured against the standards of section 13(c), and must provide for significant consideration of the positions of *both* sides in a bargaining dispute, thereby preventing unilateral employer control over mandatory subjects of collective bargaining.

Lastly, we note that ATU has contended that prior to the Secretary's decision in the present case, in instances where employees have lost the right to strike, the Secretary of Labor always has required that there be some final and binding means through neutral procedures for the resolution of disputes over new contract terms. According to ATU, the unexplained failure to adhere

to this administrative practice is, without more, a compelling reason to set aside the Secretary's certification decision. *Motor Vehicle Manufacturers' Association v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (unexplained change in administrative interpretation cannot be sustained as valid agency action). The appellee responds that there is no concrete evidence of any "administrative practice" and, even if there is such evidence, the Secretary's action in this case was a legitimate exercise of discretion.

We find the record on this last point to be a muddle. It is not clear that any "administrative practice" has ever existed as a binding agency policy; however, if one has existed, the Secretary plainly failed to adequately explain his departure from the practice in this case.

In light of the foregoing observations, we are constrained to leave the issue of wage bargaining for possible future consideration by the Secretary of Labor. In the event that Act 1506 is amended to cure the scope of bargaining problems that we have identified, and the Secretary is again presented with a wage bargaining scheme similar to the one now embodied in the state law, he will be required to make the following determinations precedent to any decision on a 13(c) certification for MARTA:

(1) Does Act 1506, or any other Georgia law, require "good faith" negotiations (as heretofore defined) over wages, to a point of impasse if necessary? If not, then it will be clear that there has been no continuation of collective bargaining as required by section 13(c).

(2) Are unresolved wage proposals subject to *mandatory* fact-finding (*i.e.*, fact-finding at the request of either party)? If not, then it will appear that MARTA retains virtually unfettered control over wages, which would be inconsistent with the mandate of section 13(c).

(3) If wages are subject to mandatory fact-finding, has the fact-finding process been established so as to allow for a full and fair airing of bargaining disputes and equitable recommendations for settlement from a neutral fact-finder? Also, is MARTA under some obligation to seriously consider the fact-finder's recommendations; if so, is this done in the full eye of public scrutiny; and, must the employer explain or justify any failure to comply with the fact-finder's recommendations? All of these factors may affect a judgment as to the efficacy of the fact-finding process as an adjunct to meaningful collective bargaining.

(4) Has there been a practice followed by the Secretary of requiring some final and binding means through neutral procedures for the resolution of disputes over new contract terms? If so, the Secretary should explain any decision to deviate from the practice.

If the state of Georgia elects to remove the obstacles to collective bargaining, *e.g.*, with respect to assignments, benefits for part-timers, hours of work and overtime, and if the existing or a similar scheme for the resolution of wage disputes is maintained, then the questions posed above must be addressed by the Secretary. However, if the state elects not to expand the scope of bargaining to allow for the continuation of collective bargaining then certification must be denied and the issue concerning wage bargaining will be moot.

## CONCLUSION

For the foregoing reasons, we conclude that the Secretary is not free to certify an agreement that does not provide for the continuation of collective bargaining rights. Act 1506 prevents the continuation of such rights by removing several mandatory subjects from the scope of collective bargaining and by arguably conferring upon MARTA unilateral control over wages. As a result, MARTA's labor protective agreement with ATU is inadequate when measured against the express requirements of section 13(c), and the Secretary's certification of that agreement as fair and equitable was therefore improper. The Georgia legislature is of course free to continue

its current policies with respect to MARTA's transit workers, but it may not underwrite those policies with federal funds. We therefore reverse and remand this case, with instructions that the District Court require the Secretary to revoke the certification of MARTA's labor protective agreement.

*So Ordered.*

GINSBURG, Circuit Judge, concurring.

Congress' apparent purpose in enacting section 13(c) was provisional—to cushion the impact on transit employees of a change from private to public sector employment. It may be that, as years pass from the time of public takeover, it becomes more appropriate to align municipal transit workers with other municipal employees rather than with persons who labor in the private sector. *Cf. Local Division 589, Amalgamated Transit Union v. Massachusetts*, 666 F.2d 618, 634 (1st Cir.1981), *cert. denied*, 457 U.S. 1117, 102 S.Ct. 2928, 73 L.Ed.2d 1329 (1982). In that light, a collective bargaining scheme that would have been characterized "unfair" or "inequitable" in 1972 might appear just and adequate in 1990. But Congress did not provide for sunsetting section 13(c) and said nothing in the text of the provision to suggest that the essential process entailed in "the continuation of collective bargaining rights" should come to mean less as time goes by. I therefore concur in the court's compellingly reasoned decision.

MacKINNON, Senior Circuit Judge.

I concur in the foregoing opinion. To my mind the Georgia statute eliminates from the collective bargaining process just too many issues that have become generally recognized as basic and traditional "collective bargaining" issues. Collective bargaining is not a precise term and is open to some reasonable definition, but whether expressly defined or not, it implicitly includes a *"good faith"* requirement. However, collective bargaining does not necessarily require *binding* arbitration to ensure that bargaining will be carried out in good faith.